LAW OFFICES OF GARY W. GORSKI
8549 Nephi Way
Fair Oaks, CA 95628
Telephone: (916) 965-6800
Facsimile: (916) 965-6801
usrugby@pacbell.net
www.gwgorski.com
GARY W. GORSKI - CBN: 166526
Attorney for Plaintiff

Co-Counsel
DANIEL M. KARALASH - SBN: 176422
(916) 787-1234
(916) 787-0267

THE UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID K. MEHL; LOK T. LAU; FRANK FLORES<br>Plaintiffs,<br><br>vs.<br><br>LOU BLANAS, individually and in his official capacity as SHERIFF OF COUNTY OF SACRAMENTO; COUNTY OF SACRAMENTO, SHERIFF'S DEPARTMENT; COUNTY OF SACRAMENTO; BILL LOCKYER Attorney General, State of California; RANDI ROSSI, State Firearms Director and Custodian of Records.<br>Defendants | CASE NO.: CIV S 03 2682 MCE/KJM<br><br>**DECLARATION OF <u>EXPERT WITNESS LT. TIMOTHY G. TWOMEY</u>** (RETIRED) |

I, Timothy G. Twomey, declare as follows:

1. I am over the age of 18, and competent to testify as to the facts and opinions stated herein, and the information contained herein is of my own personal knowledge.

2. I received a Bachelors Degree in Psychology in 1972 from California State University, Sacramento.

3. In late 1972 or early 1973, I was accepted into the Sacramento County Sheriff's Department's Reserve Academy.

4. In approximately September, 1974, I was hired as a full time Deputy Sheriff and was assigned to the Sacramento Law Enforcement Training Academy, graduating in or about January, 1975; finishing some hundredths of a point behind the top academic recruit.

Case 2:08-cv-02064-JAM-KJM Document 15 Filed 11/21/2008 Page 2 of 64

5. In 1975 (+-), I became a Certified Departmental Weaponless Control Self Defense (Koga) Instructor.

6. In 1979, then-Captain George Lotz asked me to do an analysis of the Field Training program. He specifically wanted to know if the reason for the large number of failures in the 'retread' program (the number of deputies returning to the jail system during patrol for retraining) had to do with the different academies the deputies attended. He felt there were more re-training failures for those hired with just a Reserve Training experience.

7. This instance was the first of many times that I would be asked to conduct this type of analysis. I used my experience, training and education to determine the methodology to be employed as there were no manuals on this type of study. Therefore, the discretion was completely mine as to how to perform this administrative investigation.

8. I discovered that there was a 50% failure rate in the re-tread (re-training program). That is, after passing the initial Field Training program, completing the jail time (up to 5 years) 50% of those retreaded back to the Field Training returned to Correctional Services regardless of their academy background.

9. After interviewing several retread failures, I discovered that the reasons varied for each failure: some had established seniority in Correctional Services that enabled them to bid for a day shift with weekends off.

10. Some had pressure from family life to return to a day shift only.

11. Some resented the necessary overtime Patrol Services required.

12. Some resented being ordered around like rookies.

13. But the fact remained that 50% of the deputies who underwent two training cycles returned to the Correctional Services after an expensive redundant training program.

14. In September of 1980, I was promoted to Sergeant, and was assigned to the Rio Cosumnes Correctional Center (RCCC). In March, 1983, I was assigned to the Sheriff's Staff as the administrative assistant to Larry Stamm, Chief Deputy for Security and Correctional Services.

15. During my assignment as assistant to Chief Deputy Stamm, I reviewed every

completed Internal Affairs Investigation (with the exception of one), including those alleging excessive force and breach of Departmental policy, that came to Security and Correctional Services and either passed them on to Chief Stamm, or wrote an administrative review for Chief Stamm or returned them for further investigation. I became familiar with the record keeping methods in Internal Affairs, and their access to all levels in the department, crossing all lines of authority. I became familiar with most, if not all, of the General Orders that govern the department, writing several myself. I became familiar with all of the operations that governed each division within the Security and Corrections Service area, writing, modifying and/or, if appropriate, deleting over 150 of them in the two year period.

16. In 1983, while assigned to the old main jail, I chronicled the complete lack of management control at all levels at the facility. In particular, Deputy Kelley's Morning Watch (the same Chief Deputy Kelley in many of the CCW applications) had amassed more complaints of brutality in 30 days, then the entire patrol division had amassed over the entire year.

17. This same Chief Kelly had a minimum of three IA/Divisional complaints for excessive force (e.g. 94 IA 57, 93 DIV 58, and 91 DIV 31) from records I reviewed.

18. In or around June, 1984, I was promoted to Lieutenant but remained assigned to the Sheriff's staff as the assistant to Larry Stamm, Chief Deputy for Security and Correctional Services.

19. During this assignment, I was asked by Larry Stamm to become a legislative advocate for Security and Correctional Services.

20. Larry Stamm, at this time named Chief Deputy of Security and Correctional Services by newly elected Sheriff Robbie Waters, ordered me to author the Sheriff's Staff Division budget for the 83/84 period.

21. There was no mention of any monies allocated for the concealed weapons (CCWs) permit process in the 82/83 budget which I utilized for the 83/84 budget as a bench mark.

22. I was responsible for initiating legislative changes in PC§s 4007, 4021b, and 853.6(j)

23. I also worked with Dwight "Spike" Helmick, legislative liaison for the California Highway Patrol, and Al Cooper, legislative liaison for the California Chief's of Police and the

Case 2:08-cv-02064-JAM-KJM Document 1 Filed 10/21/2009 Page 4 of 64

California State Sheriff's Association in the development of PC§ 4030, the strip search legislation.

24. In approximately January, 1985, I voluntarily transferred to South Patrol Division as the co-watch commander of morning watch.

25. Sometime in 1986, I was assigned as the South Patrol Division Executive Lieutenant, and as the relief watch commander.

26. In mid 1986, Chief Deputy Larry Stamm approached me and told me he had been selected by newly elected Sheriff Glen Craig to be the new Undersheriff. He asked me to become his assistant, which I agreed to do.

27. During the approximately 6 months prior to Sheriff Craig swearing in, I assisted the future Undersheriff in formulating structural changes within the Sheriff's Department.

28. We restructured the Field Training Program to allow newly hired deputies to complete a formal State Board of Correction 80 hours Corrections Course, then be immediately assigned to Correctional Services, instead of Patrol Training.

29. Undersheriff Stamm, <u>incorporating my findings from my 1979 Field Training Program Study</u>, decided that assigning deputies to Correctional Services instead of Patrol would:

1. Save the department a significant amount in training costs.
2. Eliminate the adrenalin rush experience that patrol training provides new deputies, only to have them face 4 to 5 to 6 years in the jail system as disgruntled "patrol" officers.
3. Save the department bodies. Those deputies that were successful in the rigorous Jail Training Program, and were successful in the custody environment, after failing Patrol Training would still have a career within the Sacramento County Sheriff's Department as custody officers. (Currently under the Patrol First program, if a recruit fails Patrol Training after an extensive and expensive Academy, she/he is released from county services)

30. In January of 1987, I was appointed the Assistant to Undersheriff Larry D. Stamm. I

was the first Lieutenant in the department to have held that assignment.

31. From 1989 through 1994, I was the Watch Commander for Evening Watch in South Patrol Division , commanding two watches, David and Edward.

32. For an approximate six month period, I was given the additional responsibility of commanding the Graveyard shift, Adam Watch; to my knowledge, the only Lieutenant in the history of the department to have such double watch responsibility.

33. During this period, I initiated several internal affairs investigations, oversaw dozens of Divisional Investigations, and conducted Watch Investigations as I deemed necessary.

34. During my ten year assignment as the Watch Commander at the Rio Cosumnes Correctional Center, I initiated about 10 internal affairs investigations, divisional investigations and watch investigations which resulted in discipline up to and including termination.

35. While I was assistant to Chief Deputy/Undersheriff Larry Stamm, I wrote, revised, or deleted if appropriate, 150 Operations Orders and Departmental General Orders. While I was assistant to the Undersheriff, I attended the weekly Service Area meetings involving all of the managers in the division.

36. In or about January of 1988, at my request, **I was assigned as the Executive Lieutenant in the Special Investigations Bureau**, and coincidentally, the Commander of the Warrant/Fugitive Bureau, a bureau larger than any other in the Detective Division.

37. During the promotional process for Lieutenant in or around 1984, I not only read each and every Sheriff's Department General Order, but I made hundreds of flash cards with these orders written on them, and studied the growing stack several times each day.

38. I continuously reviewed and studied organizational structure and divisional resources throughout my career.

39. I was informed that I had captured 2nd place in the process for promotion to Lieutenant out of over 70 candidates.

40. There was no mention of the CCW process in the Sheriff's Staff Division Budget or the General Orders during the entire time I was a member of the Sacramento County Sheriff's management team.

Case 2:08-cv-02064-JAM-KJM Document 15 Filed 11/21/2008 Page 6 of 64

41. In 1988, I was assigned as the Executive Lieutenant (currently called the Assistant Commander) of the Special Investigations Unit (SIU often frequently referred to as SID and/or SIIB, which refers to the Special Investigations/Intelligence Bureau). I was also assigned at the same time, to serve as the commander of the Warrant Fugitive Bureau, a bureau under the umbrella of the Special Investigations Unit.

42. **Then-Captain Brian Collins tasked me to start and complete the Investigations Unit 88/89 budget when Sheriff Craig first took office.**

43. Again, since there were no manuals on how to go about this task, and the only examples were prior budgets, I used my experience, training and education to determine the methodology to be employed . The discretion was completely mine to determine how to perform this administrative budget review.

44. When I completed this massive project, then Chief Deputy Valarien John Kobza, in the presence of Captain Collins, referred to my product as the best budget ever written.

45. **Following the example of the previous budget, which had been used as a template for the budget I had written, there was no mention in the SIU of any monies allocated to the CCW process. I had been informed that the CCW process was a function of the SIU.**

46. While serving as a member of the Sheriff's Staff Division, as assistant commander of the Special Investigation Unit, during my review of the Sheriff's Department General Order for promotion to Lieutenant, and while rigorously studying during at least three attempts to be promoted to Captain, I have never seen any orders, rules, or processes for the issuance of CCW permits. Never seen these allegedly existing orders, rules, or processes, even though I was very familiar with the CCW issuance law and aware that the Sheriff's Department issued CCWs. I know this from my own personal experience in that I have seen the CCW applications used and the CCW permits actually issued during the course of my career, and these permits were signed by the Sheriff.

47. Similar to what I have done in this case, throughout my career, starting as a deputy, and retiring as a Lieutenant, I conducted hundreds of administrative investigations, which

involved analyzing and summarizing thousands of documents at a time, and then resulted in an administrative determination of an issue had presented itself.

48. On numerous occasions, because many investigations involved unique situations, I drew upon my education, training and experience to determine the best method for conducting the administrative investigation.

49. I relied upon this experience when reviewing the copious volumes of materials provided by the defense in this CCW case with bate stamps commencing with the letter "D_" and other available sources of information, as noted herein throughout. My experience encompasses a breadth of information and materials which I have reviewed, experienced, relied upon, and am familiar include, but are not limited to, the following: As a Deputy, I conducted a Line inspection of the Main Jail Prisoner property processes, and later while assigned to patrol and Patrol re-tread training processes. As a Sergeant/Lieutenant, I completed: a computerized schedule for all services at the RCCC for all six or seven of its facilities, such as Staff hours at the Main Jail, Staff hours at the RCCC, Staff hours at the Courthouse, a computerized study of the type of prisoners at Main Jail, sat on the Work Release Revenue Collection Committee, the New Main Jail Architectural Committee, completed Internal Affairs reviews for Undersheriff, wrote the General Order for Misdemeanor the warrant booking process, prepared a briefing binder for Sheriff Robby Waters for his debate with Assembly Woman Maxine Waters on the then pending Strip Search legislation. Conducted a three month computerized study involving 8000 records to compare the efficiency of one-person patrol units vs. two-person patrol units, conducted a multi-agency staffing comparison to determine the relative staffing needs of officers in patrol; proposed changes to PC §s 4030, 856.J, 4007, 4032B and VC § 40508.4, many Divisional Investigations reviews, Inmate JT history at RCCC, and an Internal Affairs Termination investigation during my last week on the job.

50. I am an expert on law enforcement management policy, procedures and in particular, on conducting administrative investigations and administrative reviews. Moreover, and particularly pertinent to this case, the aforementioned expertise is very specific to the Sacramento County Sheriff's department. Most importantly, I am an expert in determining if the Sacramento

County Sheriff's Department has a set policy or criteria as to what constitutes "good cause" or lack thereof in determining who should or should not be issued a CCW.

51. Further, I am an expert in evaluating and processing large amounts of Sacramento County Sheriff's Department data, facts, and information, and rendering an opinion to a reasonable degree of certainty as to what the evidence establishes regarding the existence or lack thereof of a constituted departmental policy by custom or practice. In this case, I am a qualified expert on evaluating and processing large amounts of CCW data, facts, and information, and then rendering an opinion to a degree of reasonable certainty as to: 1) what the policy criteria is for both prima facie and non-prima facie "good cause" issuance of a CCW, and 2) whether the "good cause" criteria was applied equally to all applicants, and 3) if not applied equally, why was it not applied equally.

52. I am qualified to render an expert opinion as to the ultimate reason or reasons why Plaintiffs Lau and Mehl were denied CCWs.

**OPINION**

53. **DOCUMENTS AND EVIDENCE RELIED UPON IN PREPARING THIS DECLARATION, ALL OF WHICH IS ON FILE WITH THE COURT:** I base my opinions to a degree of reasonable certainty due to my knowledge, skill, experience, training or education; and as a former management employee of the County of Sacramento Sheriff's Department; and upon the information I have personally reviewed as noted herein and with my own percipient experience with the Department. The documents I personally reviewed and read include the following, and those produced as exhibits are the exclusive basis for my opinion, though other documents not produced bolster my opinion, and do not detract from it. However, these documents which accompany the moving and opposition papers for summary judgment are a superfluous amount needed to establish the opinions and analysis expressed herein.

54. There is no doubt that the documents identified as business records of the Defendants are in fact documents generated in the normal course of business. In fact, I recognize the handwriting on many of the Documents where it is either signed by Blanas, McGinniss and some of the Chiefs.

(1) Documents produced in discovery, paying particular attention to all CCW documents and Campaign records, all of which were verified as true and correct business records by Defendant Blanas and the County. In addition, CCW applications were verified by each applicant under the penalty of perjury, and Defendant Blanas verified his campaign records under the penalty of perjury.

(2) I read the depositions of Blanas, McAktee and Wong taken in this case.

(3) I have read the Declaration of Colanfrancesco.

(4) I reviewed the initial disclosures.

(5) I have reviewed the written CCW issuance policy and the state statute regarding issuance.

(6) I have also obtained and reviewed the expert opinion of Wendell Phillips, and his report signed August 31, 2007. His opinion only confirms what my analysis has established, and is in no way a necessary factor in my opinions or conclusions.

(7) I have read each declaration filed in support of Defendants' Motion for Summary Judgment, which said documents were filed with this Court on October 15, 2007.

55. Moreover, and in particular, I have read every page of the following documents as these are the type of document I would rely upon in rendering my expert opinions herein, and would reasonably be relied upon by other similarly situated experts in my fields of expertise for which my opinion herein is rendered:

56. The documents identified in the Declaration of Gary W. Gorski, Paragraph 2, Exhibit "A", PDF scanned copy of the relevant portions of the Deposition of Defendant Blanas, and Exhibits 1, 1a, 2, and 3.

57. The documents identified in the Declaration of Gary W. Gorski, Paragraph 3, Exhibit "B", PDF scanned copy of the relevant portions of Deposition of Amber Wong, and

Exhibits 5 and 6.

58. The documents identified in the Declaration of Gary W. Gorski, Paragraph 4, Exhibit "C", PDF scanned copy of the relevant portions of the Deposition of Aaron McAtee and Exhibit 4.

59. The documents identified in the Declaration of Gary W. Gorski, Paragraph 5, all of the following bate stamped documents commencing with the letter "D" of the approximate 4000 pages of relevant documents that were produced by Defendant Blanas under the penalty of perjury, per his discovery responses at Exhibits "G, H, J, K, L, N, R and S", and the County's response at Exhibit "I".

60. The documents identified in the Declaration of Gary W. Gorski, Paragraph 6, Exhibit "D", PDF scanned copy of the relevant portions of the Dave Baker's application.

61. The documents identified in the Declaration of Gary W. Gorski, Paragraph 7, Exhibit "E", PDF scanned copy of the relevant portions of the Blanas letter to Gerber.

62. The documents identified in the Declaration of Gary W. Gorski, Paragraph 8, Exhibit "F", PDF scanned copy of the relevant portions of the various blank CCW applications produced.

63. The documents identified in the Declaration of Gary W. Gorski, Paragraph 9, Exhibit "G", PDF scanned copy of the relevant portions of the Blanas Supplemental RPD response.

64. The documents identified in the Declaration of Gary W. Gorski, Paragraph 10, Exhibit "H", PDF scanned copy of the relevant portions of the Blanas Second Supplemental RPD response.

65. The documents identified in the Declaration of Gary W. Gorski, Paragraph 11, Exhibit "I", PDF scanned copy of the relevant portions County Second Supplemental Interrogatory Response.

66. The documents identified in the Declaration of Gary W. Gorski, Paragraph 12, Exhibit "J", PDF scanned copy of the relevant portions Defendant Blanas' supplemental to documents.

Case 2:08-cv-02064-JAM-KJM Document 156 Filed 01/21/10 Page 11 of 64

67. The documents identified in the Declaration of Gary W. Gorski, Paragraph 13, Exhibit "K", PDF scanned copy of the relevant portions of Blanas Supplemental Document Production.

68. The documents identified in the Declaration of Gary W. Gorski, Paragraph 14, Exhibit "L", PDF scanned copy of the relevant portions Blanas Second Supplemental Document response.

69. The documents identified in the Declaration of Gary W. Gorski, Paragraph 15, Exhibit "M", PDF from the County of Nevada Recorders Office, as part of public records.

70. The documents identified in the Declaration of Gary W. Gorski, Paragraph 16, Exhibit "N", PDF scanned copy of the relevant portions of Blanas Third Supplemental Interrogatory Responses.

71. The documents identified in the Declaration of Gary W. Gorski, Paragraph 17, Exhibit "O", PDF scanned copy of the relevant portions Defendant Blanas' campaign records.

72. The documents identified in the Declaration of Gary W. Gorski, Paragraph 18, Exhibit "P", PDF scanned copy of the relevant portions Approved CCW applications produced by Defendants in response to the above discovery responses.

73. The documents identified in the Declaration of Gary W. Gorski, Paragraph 19, Exhibit "Q", PDF scanned copy of the affidavit of James Colafrancesco.

74. The documents identified in the Declaration of Gary W. Gorski, Paragraph 20, Exhibit "R", PDF scanned copy of the September 7, 2006, cover letter and attached verifications for Defendant Lou Blanas' Responses to Plaintiffs' Request for Production of Documents, Defendant Lou Blanas' Responses to Special Interrogatories, and Defendant County of Sacramento's Responses to Special interrogatories. These verifications were for Sets One of the propounded discovery noted in Exhibits "F", "G", "H", "K", "L", and "S".

75. The documents identified in the Declaration of Gary W. Gorski, Paragraph 21, Exhibit "S", PDF scanned copy of the May 3, 2006 service of Defendant Lou Blanas' Responses to Plaintiffs' Request for Production of Documents, Set One, Defendant Lou Blanas' Responses to Special Interrogatories, and Defendant County of Sacramento's Responses to Special

Case 2:08-cv-02064-JAM-KJM Document 156-0 Filed 11/21/2010 Page 12 of 64

interrogatories.

76. The declarations of Lau, Mehl, and Rothery filed concurrently with the Plaintiffs' opposition papers and this declaration.

77. With regard to the "some" of the following documents I reviewed, I am denoting some of the key findings in each document as well, where a simple review of the document may not present the significance or importance of the document, unless pointed out specifically.

78. Attached hereto as **Twomey Exhibit "A"** is a true and correct PDF scanned copy of Sacramento County Sheriffs Department, Concealed Weapons Permit Issuance Policy, and Application Process.

79. Attached hereto as **Twomey Exhibit "B"** is a true and correct PDF scanned copy of the State of California, Department of Justice Standard Application for CCW License, effective "6/99", obtained directly form the State of California.

80. Attached hereto as **Twomey Exhibit "C"** is a true and correct PDF scanned copy of Sheriff John McGinness' form letter handed out by the Sheriff's Department, dated September 8, 2006.

81. Attached hereto as **Twomey Exhibit "D"** is a true and correct PDF scanned copy of CCW applicants files, maintained as business records by the County of Sacramento Sheriff's Department, and produced as such in response to Plaintiffs' Interrogatories, Set One, and Request for Production of Documents Sets One, as part and parcel to Gorski Declaration, **Exhibits "G, H, J, K, L, N, R and S"**, and the **County's response at Exhibit "I"**.

82. **Twomey Exhibit "D"** consists of a sample of selected approved CCW applications and associated records which accompanied the applications whereby these records could be directly linked with the same person contributing money to former Sheriff Blanas, and some of whom continued the contributions with Sheriff McGinniss' campaign as well.

83. These applications show some of the minimum "baseline" justifications for issuance of a CCW.

84. Attached hereto as **Twomey Exhibit "E"** is a true and correct PDF scanned copy of "denied" CCW applicants' files, maintained as business records by the County of Sacramento

Case 2:08-cv-02064-JAM-KJM Document 156-60 Filed 11/16/2009 Page 13 of 64

Sheriff's Department, and produced as such in response to Plaintiffs' Interrogatories, Set One, and Request for Production of Documents Sets One, as part and parcel to Gorski Declaration, **Exhibits "G, H, J, K, L, N, R and S"**, and the **County's response at Exhibit "I"**.

85. These applications are samples of some of the details provided by individuals who requested a CCW, and were denied.

86. Twomey's Exhibit "E" and "F" (inclusive of the Rothery Declaration) demonstrates that all these individuals provided equal or better justifications/reasons to the justifications/reasons provided in Twomey's Exhibits "D", "G", and "H", CCW applications which were approved.

87. Attached hereto as **Twomey Exhibit "F"** is a true and correct PDF scanned copy of JAMES ROTHERY's three CCW applications, inclusive of internal documents related to these three applications, which were "denied"; these records were maintained as business records by the County of Sacramento Sheriff's Department, and produced as such in response to Plaintiffs' Interrogatories, Set One, and Request for Production of Documents Sets One, as part and parcel to Gorski Declaration, **Exhibits "G, H, J, K, L, N, R and S"**, and the **County's response at Exhibit "I"**.

88. Attached hereto as **Twomey Exhibit "G"** is a true and correct PDF scanned copy of CCW approval forms consisting of internal documents related to CCW applications, which were "approved"; these records were maintained as business records by the County of Sacramento Sheriff's Department, and produced as such in response to Plaintiffs' Interrogatories, Set One, and Request for Production of Documents Sets One, as part and parcel to Gorski Declaration, **Exhibits "G, H, J, K, L, N, R and S"**, and the **County's response at Exhibit "I"**.

89. **Twomey Exhibit "G"**, Page 1, the application of John Kearns, a consultant, was approved by Sheriff Blanas directly March 30, 2006, with no purported committee review.

90. **Twomey Exhibit "G"**, Page 2, the application of Terry Burkes, a pharmacist, was approved by Undersheriff Blanas on 11/15/93, again by-passing the purported committee.

91. **Twomey Exhibit "G"**, Page 3, the application of Dave Finegold (occupation unknown) was approved by Undersheriff John McGinniss on 5/6/2003, by-passing the purported

committee altogether.

92. **Twomey Exhibit "G"**, Page 6 (see also 4-5), the application of Roger Bennett, a tax attorney, was approved by Undersheriff Henrikson, and then approved again on a renewal on 12/09/01 when Sheriff Blanas was in office without any approval signatures whatsoever. Page7.

93. **Twomey Exhibit "G"**, Page 8, the application of Timothy Morgan (CYA) was approved by Lou Blanas on 12/9/98.

94. **Twomey Exhibit "G"**, Page 9, the application of Richard Zarzana, a security consultant, was approved by Sheriff Blanas on 3/30/2006.

95. **Twomey Exhibit "G"**, Page 10, the application of Carter Vanderford, a mill worker for Setzer Forest Products, was approved by Undersheriff Blanas in 1998 though the CCW was denied by Sacramento City Police Department.

96. **Twomey Exhibit "G"**, Page 11, the application of Robert Thomas, a consultant, was approved by Sheriff Blanas on 6/8/06, and again, no committee even reviewed the application.

97. **Twomey Exhibit "G"**, Page 12, the application of Gary Stephenson of Ace Bail Bonds was approved by Sheriff McGinniss personally, completely overruling his purported committee AND Chief Kelly's denial on appeal. This is a perfect example of selective approval of CCW applications. Keep in mind that the applicant's company has been a longtime contributor to Sheriff Blanas. See Twomey Exhibit "J", Page: 135 (Defendants' Bate D_02092, see also Defendants' Bate 1752 for $1000, 1887 for $500, 2092 for $1700, and 2242 for $1000.)

98. **Twomey Exhibit "G"**, Page 13, the application of Gene W. Stinson, "business owner/Dog Show Specialties" was approved for a CCW personally by Sheriff Blanas on 1/10/06, completely overruling both the so-called committee and the appellate chief. Again, another great example that the so-called committee means nothing as far as approvals/denials are concerned. Here, the committee points out purported policy of "immediate threat" being the determining factor for approval, and that no such factor existed with regard to Stinson. Therefore, one can easily conclude, relying upon the evaluation of four peace officer managers that the applicant failed to show immediacy; there was in fact no "immediate threat" to Stinson requiring a CCW.

99. Since there is no procedure made available to the public regarding another level of

Case 2:08-cv-02064-JAM-KJM Document 56 Filed 11/21/09 Page 15 of 64

review to the Sheriff after a CCW applicant's appeal is denied, the question must be posed, "How does one get the Sheriff to personally override the decisions of both the committee and the denial on appeal of the single reviewing officer?" If procedures are equally applied, then the only other explanation is the inequitable access of some individuals to the Sheriff himself for the furtherance of his position and their own self-aggrandizement.

100. Attached hereto as **Twomey Exhibit "H"** is a true and correct PDF scanned copy of the CCW application of a "Roland Lewis" which was produced as part of "approved" CCW applications, but was missing committee notes; this application was maintained as business records by the County of Sacramento Sheriff's Department, and produced as such in response to Plaintiffs' Interrogatories, Set One, and Request for Production of Documents Sets One, as part and parcel to Gorski Declaration, **Exhibits "G, H, J, K, L, N, R and S"**, and the **County's response at Exhibit "I"**.

101. Twomey Exhibit "J", the CCW application of Roland Lewis, is made as its own separate exhibit because of its significance in that there is clearly no immediate threat mentioned, nor is there any indication that music promoters are somehow more prone to violent crime. The fact that this application was approved with such minimal information exemplifies arbitrariness.

102. Attached hereto as **Twomey Exhibit "I"** is a true and correct PDF scanned copy of screen-shots of official government websites (except Pages 12 and 13) denoting the information contained in each document, and each document denotes the government agency responsible for maintaining said information, this also includes **Twomey Exhibit "N".**

103. With regard to **Twomey Exhibit "I"** pages 12 and 13 pertaining to CCW permit holder Halverstadt, this information was obtained from The Sullivan Group's official website, a business entity well know to me because Sheriff McGinniss is a frequent guest speaker on Tom Sullivan's talk show.

104. **Twomey Exhibit "I"** consists of information any trained investigator would utilize in confirming that given individuals are associated with certain businesses, and even the nature of that association or relationship. These are some examples of the information an investigator can rely upon, but these examples are not meant to be exclusive or exhaustive. In

Case 2:08-cv-02064-JAM-KJM Document 1560 Filed 10/16/2010 Page 16 of 64

attempting to confirm or deny these relationships, an investigator must know where to look for information and must recognize the relative reliability of the information gleaned from his sources. Government websites which publish records on individuals and corporations are generally deemed to be particularly reliable sources of information.

105. A good example of the relative reliability of a source of information is whether or not an investigator could also rely upon this source as one of the bases for serving an arrest warrant on an individual; in this case, Halverstadt. In this hypothetical, simply reading **Twomey Exhibit "I"** pages 12 and 13, the following could be gleaned to assist the officer in executing the warrant: 1) known associates, 2) employment location, 3) that he lives somewhere in Granite Bay, and that he was possibly a member of the U.S. Army Special Forces (Green Berets), making him a possible dangerous arrestee. The more reliable information that is available, the more it can be cross-checked for accuracy.

106. Attached hereto as **Twomey Exhibit "J"** is a true and correct PDF scanned copy of Defendant Blanas' campaign records which were produced as public records having been maintained as business records by the County of Sacramento, and produced as such in response to Plaintiffs' Interrogatories, Set One, and Request for Production of Documents Sets One, as part and parcel to Gorski Declaration, **Exhibits "G, H, J, K, L, N, R and S"**, and the **County's response at Exhibit "I"**. Further, I recognize Defendant Blanas' signature under the penalty of perjury authenticating the accuracy of the documents. The Defendants bate stamps are in order, but some pages were deliberately pulled out. Since the pages contained only campaign expenditure information there was no reason for these redactions and lack of production. One can reasonably conclude that there was apparently some concern on Defendant's part regarding further revelations about who had made contributions to his campaign, and how much.

107. Attached hereto as **Twomey Exhibit "K"** is a true and correct PDF scanned copy of the Washoe County Assessor, State of Nevada screen-shot of an official government website denoting the information contained in the document, and the document denotes the government agency responsible for maintaining said information. This is a public record of property Defendant Blanas owns in Washoe County with CCW permit holder, Gerber.

Case 2:08-cv-02064-JAM-KJM Document 56 Filed 11/21/2009 Page 17 of 64

108. Attached hereto as **Twomey Exhibit "L"** and “M” are true and correct PDF downloads from a State of California Department of Justice official government website denoting the information contained in each document for the respective years of 2005 and 2006, and each document provides the total number of CCWs issued per county in California for each calendar year.

109. The information contained in this exhibit conclusively demonstrates that preceding each election year, there is a marked increase in the number of CCWs being issued in Sacramento County. However, particularly noticeable is that immediately before Defendant Blanas’ first run for Sheriff in 1998, there was approximately a three-fold increase in the number of CCWs being issued. Though it may be true, that at this time, other intra-county jurisdictions could have been issuing CCWs, this marked increase during the election cycles every four years, taken with all of the other factors, shows that there is a problem of CCWs being issued for political gain.

110. Attached hereto as **Twomey Exhibit "O"** is a true and correct PDF scanned copy of Defendant County of Sacramento Sheriff’s Department computerized CCW permit applicants’ information, including name, address, and date the applicant’s permit was either issued or denied. These records are maintained as business records by the County of Sacramento, and produced as such in response to Plaintiffs’ Interrogatories, Set One, and Request for Production of Documents Sets One, as part and parcel to Gorski Declaration, **Exhibits “G, H, J, K, L, N, R and S”**, and the **County’s response at Exhibit “I”**. Further, I recognize this type of document as the type of information maintained by the Sheriff’s Department. The Defendants’ bate stamps are in order as they were served with their discovery responses. This document supplements the information contained in Gorski Declaration Exhibits 1, 2, and 3.

111. The facts and data in this particular case upon which I base my opinions and inference are those perceived and known to me before the preparation of this declaration, and are the type of facts and data reasonably relied upon by experts in the field of law enforcement management and investigations in forming opinions or inferences upon the subject for determining policy, or lack of policy, and breaches thereof; in this particular case, assessing the

Case 2:08-cv-02064-JAM-KJM Document 56 Filed 10/21/2009 Page 18 of 64

CCW issuance policy, determining what that policy is, and whether the policy, if any, is equally applied.

112. The approximate 4000 pages of documents with Bate stamps produced under the penalty of perjury, and business information from the County of Sacramento Fictitious Business Names listings and the California Secretary of State Corporate Records search are facts and data in this particular case upon which I base my opinion and inferences perceived by me or made known to me before the preparation of this declaration, and are of the type reasonably relied upon by experts in the my particular field in forming opinions or inferences upon the subject.

113. As a trained investigator and Sacramento County Sheriff's Department manager charged with administrative reviews of policies and investigations, the documents specifically identified herein are documents I, and any other individual in my capacity, would rely upon in formulating the opinions expressed hereby as they are VERY reliable, in that all documents were produced under the penalty of perjury at multiple levels. For instance, most CCW applications are signed under the penalty of perjury (post June 1999). Likewise, campaign contribution reports are signed by Defendant Blanas himself under the penalty of perjury. Therefore, these documents are heavily relied upon for the purposes of my analysis and opinion.

114. After a chance to review the CCW applications that had been turned over, it was discovered that some CCW applications, portions of applications, and documents have been "purged", per for example, at memos at D_04065 and D_02788, a PDF scanned copy of which is attached hereto as Twomey Exhibit "D", Pages: 102, 125. There is no reason given for this, nor was there any evidence that it was approved by management.

**PRELIMINARY ANALYSIS**

115. In California, a CCW (Carry-Concealed-Weapon) permit is issued by the local Sheriff or Police Chief in which the applicant resides. (PC §12050. (a) (1) (A) The sheriff of a county, upon proof that the person applying is of good moral character, that good cause exists for the issuance, and that the person applying satisfies any one of the conditions specified in subparagraph (D); (D) For the purpose of subparagraph (A), the applicant shall satisfy any one of the following: (i) **Is a resident of the county or a city within the county**. (ii) **Spends a**

**substantial period of time in the applicant's principal place of employment or business in the county or a city within the county.** And, (ii) if the licensee's place of employment or business was the basis for issuance of the license pursuant to subparagraph (A) of paragraph (1), **the license is valid for any period of time not to exceed 90 days from the date of the license.** The license shall be valid only in the county in which the license was originally issued. The licensee shall give a copy of this license to the licensing authority of the city, county, or city and county in which he or she resides. **The licensing authority that originally issued the license shall inform the licensee verbally and in writing in at least 16-point type of this obligation to give a copy of the license to the licensing authority of the city, county, or city and county of residence**. **Any application to renew or extend the validity of, or reissue, the license may be granted only upon the concurrence of the licensing authority that originally issued the license and the licensing authority of the city, county, or city and county in which the licensee resides.**

116. Defendants somehow attempt to equate this as giving them the authority to issue temporary 90 day licenses for “emergency” purposes. The above section pertaining to the 90 day “provisional” license relates solely to the location of the applicant, and not the underlying facts for issuance. In addition, the statute DOES NOT allow a license to be issued without all the applicable pre-requisites of CCW issuance being first met. A good example of this abuse is noted below with regard to the CCW application and approval of Ed Gerber below.

117. This section of the law is violated many times by the Sacramento County Sheriff’s Department, in that CCWs were issued to out-of-county residents. (For example, at D-2520, 2594, 2671, 2826, 2485, 2854, and 2887.) This fact is important regarding the blatant abuse of discretion in handing out CCWs, and indicative of the flagrantly subjective reasoning which was used to determine who was issued or denied CCWs in Sacramento County. However, it was not necessary to rely upon this fact for the ultimate conclusions I render herein. Again, it was just another red-flag for me that there is an obvious systemic problem.

118. To obtain a CCW, one must pass a background check and pass the mandatory

training requirement. However, approval of a CCW permit is left up to the discretion of the local Sheriff or Chief. The facts overwhelmingly support that this discretion is abused in that campaign contributors (or those with access to the Sheriff) and those with linkage or ties to campaign contributors, invariably have a substantially increased likelihood of receiving a CCW, as compared to all other applicants. This fact holding true even where the campaign-contributing applicant's justification for a CCW is inherently weak or non-existent when compared to those who did not make campaign contributions. Hence, there is no "good cause" standard.

METHODOLOGY EMPLOYED

119. All information, facts and evidence reviewed and relied upon was generated either before, during, or after each of the Plaintiffs applied for CCWs. Information, facts and evidence generated after Plaintiffs were denied CCWs is highly probative in that it allows me to determine baseline standards for CCW issuance at different points in time. And, in fact, there is a consistency to the issuance and denial process over time; with regular increases in issuance prior to elections. The aforementioned proving that the "unwritten" CCW policy, as actually employed and practiced, constitutes a longstanding pattern, and that it constitutes the "normal operating procedure" of the County of Sacramento Sheriff's Department, and that it continues till this day.

120. First, I reviewed the boilerplate written policy which identifies "good cause" as being the main thrust for issuance. Attached hereto is a true and correct copy of the policy that was, and still is, in effect as Twomey Exhibit "A".

121. In 1999, the Attorney General (AG) was mandated with creating a new state-standard CCW application form to replace local agency forms no-later-than July 1, 1999. Use of any other forms once the new forms were distributed is banned by the same state law.

The specific law is Penal Code 12051(a)(3)(A).

122. Next, I reviewed the California Department of Justice, STANDARD APPLICATION for LICENSE TO CARRY A CONCEALED WEAPON (CCW). In that application, the following is noted: "PC section 12051(a)(3)(A) requires the Attorney General to prescribe a statewide standard application form for a CCW license." "The licensing authority specified in PC section 12050(a)(1) (a sheriff . . .) may issue a license to persons who are of good moral character, who have completed a course of training, and where **good cause** exists for issuance of the CCW license." " .. jurisdictions may require **psychological testing** on the initial application .." Attached hereto is a true and correct copy of the DOJ Statewide Standard CCW application that was, and still is, in effect as Twomey Exhibit "B".

123. "Sections 6, 7, and 8 **must** be completed in the **presence of an official** of the licensing agency." That Defendants were well aware of this instruction is supported by evidence that Sheriff Blanas, at least at one point, informed "some" applicants of this mandate. See **Twomey Exhibit "E"**, Page: 30, form letter to applicants in 2005.

124. Here, I note that Plaintiff Mehl in accordance with these instructions, did not fill out Section 7 pertaining to the "investigators" interview, but waited for an official to contact him. However, though his application was twice denied, he was never contacted or instructed to complete his application in the "presence of an official of the licensing agency." Therefore, the Defendants' policy was deficient from the start; as Amber Wong confirms, the *practiced (i.e. actual)* policy was to *not* contact CCW applicants. Pl. Exh. "B", Wong Depo . 17:12-19:11. This failure to abide by even completely objective written instructions and guidance lends itself to a conclusion that the entire CCW policy and practice was subject to the whims of the Sheriff either directly or via his committee, and constitutes a clear failure and flaw in the CCW policy from the start. See **Twomey Exhibit "B", "E"**, Page: 30, form letter to applicants in 2005,

Case 2:08-cv-02064-JAM-KJM Document 56 Filed 10/21/2009 Page 22 of 64

showing how the public was informed in writing how to fill out the applications. There is no evidence that any such letter was provided to Plaintiff Mehl.

125. This Standard DOJ application is made available to the public from any law enforcement agency that issues CCWs, or the State DOJ. A true and correct copy of this official state CCW application that was obtained from the State DOJ several years ago is attached hereto Twomey Exhibit "B", and is identical to the form still being used as it has not been revised since "6/99". See lower left hand corner of first page of application denoting its publication date.

126. The Sheriff's Department own written policy specifically states "Good cause exists for issuance of a concealed weapons permit as follows: General: The determination of good cause for the issuance of a concealed weapons permit is perhaps the most difficult aspect in this process. While every applicant may believe that he/she has good cause for a license, **the Sheriff's** determination is based on consideration of public good and safety. (Law)" Twomey Exhibit "A".

127. This policy is broken down into two separate standards, known as "Prima Facie Good Cause" and "Non-Prima Facie Good Cause." This has been the general policy for years. This document is attached as Twomey Exhibit "A".

**THE DEFENDANTS' CCW APPLICATION PROCEDURE AT THE TIME OF PLAINTIFF MEHL'S AND PLAINTIFF LAU'S DENIALS OF THEIR CCW APPLICATIONS**

128. For my analysis, I first ascertained the purported or alleged procedure for reviewing, processing and approving/denying CCW applications, and any appeal thereafter. For this determination, I relied upon the deposition of Amber Wong and Defendants' declarations in support of their motion for summary judgment.

129. Defendants purport to have established a rigid procedure for reviewing CCW

Case 2:08-cv-02064-JAM-KJM Document 150 Filed 11/16/10 Page 23 of 64

applications consisting of a three panel review committee, and a right of appeal to a single person who was not part of the original review process.

130. However, I have uncovered numerous instances where the Sheriff or Undersheriff personally got involved in the approval process. In these instances the CCW applicant either bypassed this purported procedure totally and went directly to the Sheriff/Undersheriff, or the Sheriff/Undersheriff overruled the three member panel. This issue is addressed below.

131. However, my first order of business was to determine what constituted "good cause", as that standard was enumerated in Twomey Exhibit "A" and allegedly applied in denying and approving CCW applications.

**THE BASELINE FOR "GOOD CAUSE"**

132. In order to determine what constitutes "good cause", and in particular Non-Prima Facie Good Cause, I reviewed those applications that were approved to establish what is commonly referred to as a "**baseline**."

133. I was at a disadvantage from the start because the "APPROVED FILES" which were produced only consisted of two pages, neither of which was dated. The Committee Finding page was missing, and therefore I could not read the notes of the members. In stark contrast, the "DENIED FILES" were in most cases 13 pages long, and included the notes made by any committee member.

134. From those applications that were approved, the following examples are provided as applications I reviewed and relied upon to determine what facts and information are relied upon by the Department to constitute Non-Prima Facie Good Cause for issuance of a CCW:

1. "Self Defense of family, business 2 Private Property   Have had a ccw since 1948.   The last to men that I apprehended, one was on parol the other had a $1000 dollar warrant. since 1948 conditions have not

improved." **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D_02501. This application, and other similar justifications stated in applications are also contained in Twomey Exhibit "D, G, and H".

2. "Physician taking call. Need to go out at all hours." **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D_02589. This application, and other similar justifications stated in applications are also contained in Twomey Exhibit "D, G, and H".

3. I have had a permit for about 20 years while both employed and retired. Basically for self protection while doing vast amount of traveling in California. This also included camping and fishing in remote areas." **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D_02519. This application, and other similar justifications stated in applications are also contained in Twomey Exhibit "D, G, and H".

4. Jack Kimmel, of Kimmel Construction, Inc. "Self Defense" **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D_02653-02654. This application, and other similar justifications stated in applications are also contained in Twomey Exhibit "D, G, and H".

5. Roland Lewis, issued July 22, 1995, "Self Protection Bus. Related" **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D_02676; Twomey Exhibit "H".

6. David Mastagni, Lawyer, "course of business." **Gorski Decl. Plaintiff's Exhibit "N", Bate #** 02693-02694. This application, and other similar justifications stated in applications are also contained in Twomey Exhibit "D, G, and H".

7. John Valensin, "Self Protection overseeing trespass & game violations on large ranches. Threatning [sic] calls from people whom Ive [sic] had arrested. & vandalizing large equipment on property. **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D 02889. This application, and other similar justifications stated in applications are also contained in Twomey Exhibit "D, G, and H".

135. Their dates of approval are contained on the document itself and/or Twomey Exhibit "O".

136. These individuals had their CCW applications approved prior to Plaintiffs' applications, and these, according to Defendants' best records, are still active and valid. Hence, I used these as the benchmark or "baseline" as to what constitutes "good cause."

137. The next thing I looked at was the generic reason for denial for each and every application made available, including Plaintiffs. It is clear that the same form letter was mailed out to almost every applicant whose request for a CCW was denied. An example of a letter mailed out on these denials is located at **Gorski Decl. Plaintiff's Exhibit "N", Bate #** D_01066. Pay particular attention to the reason for rejection in that: the applicant "did not provide **convincing evidence** that applicant or family members are in any **immediate danger** associated with everyday course of living as to justify the need to carry a concealed weapon." "Applicant may have a weapon at **home** and in **business**." "If your circumstances change and you wish to re-apply you may do so after one year from the date of denial."

138. In addition, various notes are found in the applicants' files stating "insufficient" good cause or reason provided. These notes are consistent with the statement of fact in the rejection letters.

139. Again, since the committee page was not provided with most of the approved

Case 2:08-cv-02064-JAM-KJM Document 60 Filed 11/16/2009 Page 26 of 64

applications, I cannot compare notes.

140. Based solely upon this form denial letter, it is reasonable to conclude that "good cause" is equated with "immediate" danger, and not some vague perception or remote possibility of danger. Thus, the public is informed that this is what constitutes "good cause" (i.e. immediate threat). This is consistent with what Mr. Lau described during his appeal when he was accused of not documenting his danger with police reports.

141. Several points must be made regarding these denial letters. First, it correctly states the law, in that a person may arm themselves in their place of business (i.e. owners of the business or by permission of the owner) and they may have a loaded firearm in their home.

142. Second, the rejection letter states "immediate danger" must be proven.

143. Therefore, the denied applicants and general public are being informed and instructed that the "official policy" as far as the general public is informed is to: 1) prove "immediate danger" (i.e. exigent circumstances), and 2) that the CCW is NOT issued for defense of home or business.

144. There is also a third implied category, which is that an individual may NOT use deadly force to protect property – though not stated, any self defense course would teach this.

145. What was very obvious from reviewing the "approved" applications is that the lowest threshold for "approved" status was everyday generic "self defense", and everyday defense of "business". Most troubling is that the Sheriff's Department has approved CCWs wherein the applicant stated a need for a CCW for"defense of property" and even to stop "vandalism" to property; though every peace officer, presumably including the CCW reviewers, knows that deadly force shall never be used to defend property as we, as a society, place a higher value on human life than property. Ironically, many applicants, whose applications expressed justification that impressed the reader with regards to real imminent danger, had their CCWs

denied with notations which cautioned that ‘issuance could render a liability problem for the Sheriff’s department”. It is a truism that many applicants who are issued CCWs, by virtue of their requirement to have a permit, do not have a law enforcement or law background. Even more ironically, regarding the Sheriff’s department apparent concern with liability, it could be argued that issuing a CCW to an applicant who uses the justification that he needs to protect his personal property is likely providing him with tacit approval/instruction that it is lawful and approved of to use deadly force in these instances.

146. Anticipating that Defendants will argue that I “cherry picked” the most extreme examples, I can show that these were exemplary applications and quite characteristic of the approved applications. More importantly however, where the justification was very ‘weak’ the applicant was invariably a campaign contributor or linked to a campaign contributor. To be fair, there were instances where approval was for much more compelling reasons. However, I focused my analysis on the minimum policy parameters for approval, and that is what is at issue. Because campaign contributions and access to the Sheriff are so important to obtaining a CCW, there are far, far more campaign contributors with approved applications based upon frivolous justifications than applications that are compelling.

147. For instance, many of the CCW applications were approved whereby the applicant’s stated justification was “carries large sums of cash,” or “self defense”, or working in high crime areas, most notably the applications contained in Twomey Exhibit “D”, for example:

(a) Edwin Gerber. Twomey Exhibit “D”, Page 1, 7.

(b) Ernest Martini. Twomey Exhibit “D”, Page 11.

(c) Ben Upton. Twomey Exhibit “D”, Page 13.

(d) Jack Kimmel. Twomey Exhibit “D”, Page 19.

(e) Roland Lewis. Twomey Exhibit “H”.

(f)     And many others that I did not even include, but this is just

a note to me for future testimony: Roger Brown (D 2511);

Ronald Brusato (D 2514); Barry McClain (D 2701), etc.

148.  In contrast, a vast number of CCW applicants were denied after using a much more compelling justification, or the same, and admittedly weak verbiage in their justification; their common denominator being that they had *not* made campaign contributions, nor did they *know* or have *access* to the Sheriff.  It is also noted that among those denied, the reviewing panel sometimes required additional proof of a threat, or denied the applicant based upon the applicant's inability to articulate an immediate threat.  This reason, a lack of "immediacy" regarding danger written in various forms, in fact, being one of the most common reasons for denial.

149.  For instance, see the applications contained in Twomey Exhibits "E", "F", and the Declaration of Rothery, James.  A note to myself is that Razumolski, Sergy (D 1046 & 1054) also falls into this category as well.

150.  In sum, I have determined that the Sheriff's Department approves CCWs without any form of verbiage to this effect, much less proof regarding "immediate danger", when it suits their purposes to do so.

151.  After establishing the lack of a "baseline" criteria for issuance, I then reviewed denied applications to establish a basis for what the Department used in determining when applications were denied.

152.  When I compared the justification for the approved applications with those of the denied applications, I was astonished in that applications were denied for the same or similar reasons while others were approved.  There appeared to be no consistency regarding denial and approval.  A simple comparison between approved (Twomey Exhibit "D", "G", "H") and denied

Case 2:08-cv-02064-JAM-KJM Document 56 Filed 10/16/09 Page 29 of 64

applications (Twomey Exhibit "E", "F" and Lok Lau's) is all that is needed to support this conclusion.

153. Based simply upon the applications, there was only one conclusion that can be drawn from this lack of consistency; I can state to a degree of reasonable certainty that there is no "good cause" policy or criteria for issuance or denial of a CCW application, and at a minimum, it is simply arbitrary and capricious with absolutely no sense objectivity or baseline criteria being used.

154. From this determination, I then attempted to figure out why CCW applications were arbitrarily and capriciously being issued.

155. I looked at the what was different between those applications that were approved as compared to those that were denied.

156. There was a general commonality on certain parts of all but a very few of the CCW applications; that is most applications were identical in that they answered "no" to the prohibited categories, such as criminal convictions, mental incompetency, or any other disability that would affect the "character" of the applicant's ability to own, possess or use a firearm, whether concealed or otherwise.

157. Ignoring the aforementioned areas of justification, after the routine screening of the applicant for "fitness" to own, carry, and possess a firearm, the remaining differences in each application were the person's name, address, job description, and employer as being information that would differentiate each application as being unique.

158. Hypothesizing that some types of employment or businesses are more inclined to need a concealed weapon, such as private investigators, I looked at those applications next. And I did, in fact, find that private investigators, were somewhat more likely to be approved, though this approval was more certain if they were affiliated with a well-known agency, and a campaign

contributor, and far less certain if they were self-admittedly "self employed" and not a campaign contributor.

159. For instance, Approved: D 2474, 2487, 2500; Denied: D 928-926, 1057, 1151. Still, this did not resolve the arbitrariness and capriciousness for CCW approvals and denials, so I set this issue aside.

160. When employer information was cross-referenced with employers who had made campaign contributions, the number of applicants who were employed by contributors and were approved was significant. Thus, I focused my attention on this observable fact.

161. Additionally, Sheriff's Department affiliations such as "SSD Aero Squadron" and "Sacramento Sheriff's Posse" seemed to be buzz words or alerts to those evaluating the applications. This is discussed below. Though in some cases there were applicants who entered this information in vain and were denied CCW permits, more often than not, these words seemed significant to a very weak application in alerting a reviewer that this was an applicant who might be more deserving of approval or further review.

162. Therefore, it is my expert opinion, based upon a degree of reasonable certainty, that the County of Sacramento Sheriff's Department and then Sheriff Blanas, and now Sheriff McGinniss have absolutely no policy or criteria as to whom is issued a CCW for non-prima facie good cause applications. At best, it is random and capricious with approval more likely to be given to well-known employers, campaign contributors, or those with Departmental affiliations.

163. Therefore, I further examined the pattern that was now being established, and focused my attention on external factors that would affect the probability of an application being approved and those being denied.

164. The next part of my analysis was to determine what was the single most important common denominator in a CCW application being either approved or denied. To determine this,

I had to isolate a common denominator among the approved applications.

165. I was retained by Mr. Gorski, Mr. Mehl, and Mr. Lau to determine if their postulation was correct (i.e. **that CCWs are issued at an inordinate rate to political supporters of the Sheriff, since it is the Sheriff himself who issues CCWs**.).

166. Therefore, I started my analysis by first obtaining the facts, primarily a list of names of those who contributed to Defendant Blanas' political campaign. For this, I reviewed Defendant Blanas' public record contribution records that were signed by him under the penalty of perjury.

167. Therefore, my starting point was campaign contributors.

**THE COMMON DENOMINATOR AMONG APPROVED APPLICATIONS**

168. Before I began my analysis, I first made a cursory review of CCW permit holders, and compared those names with those listed on campaign contributions.

169. According to Detective Mason's own notes to file, all CCW records prior to 2003 have been purged. I have never heard of a law enforcement agency throwing away information unless ordered to do so. Archived information regarding jail prisoners, jail visitor's information, and pawn shop information, as only a few examples, are all very important databases for law enforcement agencies. This remarkable and questionable step of 'purging' information was taken with no apparent authorization from the Sheriff nor was it in compliance with any record retention policy. See Twomey Exhibit "D", Pages: 102, 125.

170. After reviewing the list, and comparing names and associated companies with campaign contribution records, I was able to isolate over 80 individuals who received CCWs and contributed to Sheriff Blanas' campaign.

171. Thus, my next task was to take my preliminary notes and create a database of all known CCW applicants. For this, I retained the services of David Orsay, a highly decorated

Special Forces soldier, trained in and whose duties frequently require intelligence analysis work, and who holds a “Top Secret SCI with CI polygraph” security clearance. This was necessary because Mr. Orsay was the only other person I knew with the expertise to crunch large amounts of data with me, and create a database of campaign contributors and CCW permit holders, those approved and denied, Sheriff departmental affiliation, addresses, cross-referenced with business and employer affiliations as obtained from campaign records and CCW applications, and all the while keep track of the Bate stamps from the source documents.

172. Mr. Orsay, a published author and former Special Forces operative who worked on highly classified operations and materials, former Deputy U.S. Marshal, and most recently a contractor for the government in Iraq, has extensive experience in intelligence assessments, analysis, threat assessments, etc. – his expertise and opinions are the type of resources I would rely upon as both a trained investigator and a law enforcement manager.

173. In addition, since time was of the essence, and my disability would prevent me from typing in much of the information, Mr. Orsay did most of the typing while I reviewed each application and campaign record, and collaborated with Mr. Orsay regarding what was to be added. Between Mr. Orsay and myself, we (predominately Mr. Orsay) were able to construct a massive database of names (individuals and business), addresses both current and former, aliases (i.e. usually misspellings), CCWs issued and denied dates, whether the applicant contributed money, when, and whether such contributions were personal or linked with that applicant’s own, or another company.

174. Together, we were able to reconstruct and isolate the name of each business and its corporate tree (Organization, subsidiary, and company) linked to each individual CCW applicant based upon the information provided in the applications and/or campaign records and those made available through government databases.

Case 2:08-cv-02064-JAM-KJM Document 56 Filed 10/21/2009 Page 33 of 64

175. For the purposes of this opinion, however, I used this database only as a basis for more quickly querying relationships and determining where to probe more deeply into the volumes of documents provided to us by Defendant. The database simply reduced labor. For example, one can imagine *not* using a computer database, but instead organizing the information in carefully labeled piles according to dates, and names, with Post-It notes, highlighting, and notations to help with cross-referencing. Our computerized database was a tool which added no new information to what we had received; it simply allowed me to more quickly analyze what we had received.

176. After a careful analysis of the data, it was very evident that there was a very strong correlation in that campaign contributors and their relatives, family members, and business associates indeed have a definitive advantage in obtaining a CCW. In fact, anyone who has contributed over several thousand dollars is virtually guaranteed a CCW, if they apply. However, it is rare that even those making smaller contributions are turned down for a CCW. When a contributor was denied, it was most likely other disqualifying extenuating circumstances, such as a lack of residence, criminal history, or a history of domestic violence which was the reason. At the time I prepared my expert report, I did not have this database available, and now I realize there are a few very minor campaign contributors who had not received a CCW, though they had applied. However, with this caveat, my opinion remains the same.

177. Thus, the database was not used in any way as a basis for my opinion. It was just a tool used to focus my attention on individual applications. My opinion is based solely upon the CCW applications themselves, the CCW issued spreadsheets, and the campaign contributions, and then cross-referenced with government license databases. I performed my analysis using my background, training, and experience using the same or similar type of methods that I have employed when conducting Department reviews and criminal investigations.

Case 2:08-cv-02064-JAM-KJM Document 56 Filed 11/16/2009 Page 34 of 64

**OPINION ON THE EFFECT OF CAMPAIGN CONTRIBUTIONS, CONNECTIONS TO ELECTED SHERIFFS' AND MANAGEMENT, AND THE ISSUANCE OF CCWS**

178. First, the identification and confirmation of people's identities, backgrounds, and relationships to other people or business entities is a basic skill used daily by all law enforcement investigators. In the course of criminal investigations while interviewing and researching, we are given or find a partial name, partial address, or pieces of information that must be cobbled together with other pieces of information and then confirmed.

179. This confirmation process has been rendered less difficult and more certain through the years, first through the advent of computers and databases, and second through internet information "open" sources such as official Federal, State and County licensing agencies (e.g. SEC, Secretary of State, and County Fictitious Business Names Records), most of which are all available online. Even property records in some counties are online now, as will be shown below with the Gerber/Blanas connection.

180. The second aspect of my analysis wherein I describe placing myself in the CCW application reviewers' "shoes" also draws upon my background, training and experience with the Sheriff's department, and my familiarity with commonly accepted Sacramento Sheriff's department administrative policy and procedure. Because I performed administrative reviews for the Sacramento County Sheriff's Department for years, I am aware that reviewing an applicant's fitness for a CCW is not a black-and-white process of simple denial or approval; but may require careful consideration of some subjective factors once the threat of danger to the applicant has been confirmed.

181. Often these practices are unwritten and I take this into account when conducting my

analysis.  In fact, without belaboring the point, I am particularly well suited to analyze these reviews; I share many common denominators with those who actually conducted them; and during my time with the Sheriff's department might have conducted the actual CCW reviews of applications myself ,if asked to do so, without missing a beat.

182.  The methodology for connecting campaign contributors with CCW permits holders, though somewhat tedious, is a relatively simple process of elimination.  In many cases this is not necessary since the contributing company has specifically noted the individual 'behind' the contribution on the document itself linking a name to a contributing company. That contributing company may be the employer that the applicant then lists on his application, confirming the relationship.  Or the address of the individual contributor is noted and matches the address on the CCW application.

183. However, where the linkage is less certain, I use the following methodology to confirm relationships and identities.  First, I compare the names on the list of permit holders provided by Defendants under the penalty of perjury (See Gorski Decl., Exhibits "1-3", and Twomey Exhibit "O") with public campaign contribution records signed by Defendant Blanas under the penalty of perjury listed in Twomey Exhibit "J".  When I get a name match, I then confirm that the same person is being identified in both documents by either comparing the addresses provided or the name of the business as identified in both the CCW application and the campaign contribution list.

184. So, for example, with Edwin Gerber, Twomey Exhibit "D", Page 6, Gerber lists "Energetic" as the business name with an address on "Orange Grove".  I then locate Gerber's name or business on the campaign records, and compare addresses.  Here, on Twomey Exhibit "J", Page 171 I find "Energetic Painting and Drywall, Inc." with the same street name, but a different number.  At this point, I confirmed the match even though the street numbers are not

Case 2:08-cv-02064-JAM-KJM Document 156 Filed 11/21/2011 Page 36 of 64

identical. The probability is very low that there would be two businesses sharing the same rather unique name but owned by different people on "Orange Grove" avenue.

185. In order to eliminate all doubt, I simply confirmed the address with the California Secretary of State online "Business Portal" (See http://kepler.sos.ca.gov/corpdata/ShowAllList?QueryCorpNumber=C1137947 ). On the State of California's website, which is a very useful and common investigative tool in law enforcement for quick verifications of corporate businesses, the State of California has a corporate record for "Energetic Painting and Drywall, Inc.", establish on "4/1/1983" with a business address of 3030 "Orange Grove Ave, North Highlands, CA 95660". For the Agent for Service of Process one "Ed Gerber" is identified with the same address.

186. Therefore, I have now established that the "Ed Gerber" who had a CCW issued by Defendant Blanas is the same Ed Gerber who owns and/or is affiliated with Energetic Painting and Drywall that contributed the $3,600.00 to Defendant Blanas as noted at Twomey Exhibit "J", Page 171. My methodology has been verified as extremely accurate by Defendant Blanas himself. See Blanas Depo. 46:7-16, 47:9-48:25. I employed this technique throughout.

187. In addition, since many of Defendant Blanas' campaign contributors are contractors or are involved in real estate, whenever it was appropriate, I also cross-referenced names with the State of California Contractors State License Board, which allows consumers to verify whether a person or company is a licensed contractor. See http://www2.cslb.ca.gov/General-Information/interactive-tools/check-a-license/License+Request.asp and http://www2.dre.ca.gov/PublicASP/pplinfo.asp .

188. There, I searched for Gerber by name and the name of his company, and the search function pulls up his contractors license, and all the names he has conducted business under, again confirming his address. Likewise, I also searched CCW permit holders names on the

Department of Real Estate (DRE) website for individuals even closely associated with real estate

sales or development at the State of California's website for consumers to verify real estate agents

and brokers licenses. Again, another commonly used investigative tool in law enforcement. See

http://www2.dre.ca.gov/PublicASP/pplinfo.asp

189. Using these and other similar methods, there are many ways to cross check names to

ensure that the same person is the one being identified in the County campaign records and the

County CCW permit records identified as Twomey Exhibit "O", D_01538-01641, a business

record or the Sheriff's Department listing CCW permit holder provided in discovery.

190. Since many CCW applications were only partially produced, totally missing, or

heavily redacted, I could only review those applications and portions of the applications made

available by Defendant. If I had been provided all complete CCW applications with no

redactions, I made the assumption that the pattern of approving and denying applications would

not be any different than the pattern I determined based upon what was produced. In fact,

because Defendant may suffer should the CCW permit process be found unfair, it is more likely

than not that any materials purposely not produced by Defendant would provide even more

support for Plaintiff's arguments.

191. First, a quick review of some of the key facts upon which my analysis is based.

These are only a few examples of the totality of evidence I reviewed and relied upon. However,

these alone are sufficient to support my opinion.

192. I read the declarations supporting summary judgment and the depositions. It is clear

the initial three member panel that purportedly reviews applications does just that - 'reviews' only

the applications and the notes contained therein. The only purportedly considered evidence

reviewed is what is in the actual application itself because the applicant, if contacted and

questioned at all, would not be present for questioning during the actual approval/denial process.

193. Therefore, I am looking at the effect of the written applications on the key personnel reviewing the applications in determining why applications are approved or denied; I place myself in the reviewers' shoes by focusing on only the application, and determining why or why not an application could be approved. In this regard, I'm reviewing these documents for the effect of the information on the reviewer, and I'm not offering the information for the truth of the matters asserted in the applications. For the purposes of my analysis, it is irrelevant whether the information and statements in the applications are true.

194. The sample of applications referred to hereafter are the more egregious representative applications of those who were campaign contributors or those whom were affiliated with campaign contributing companies. Why did I choose these applications as examples? After reviewing all of the materials produced I now know that CCW permit approval requires either: 1. affiliation with law enforcement, or 2. acquaintance with the Sheriff, or 3. a campaign contribution/campaign contributor affiliation. Emphasis on any one of the three areas such as particularly large contributions, Reserve officer status, or being a close friend of the Sheriff go far in assuring approval of a CCW application. A strong combination of two or more of the 'requirements' virtually assures approval. Our sample provides applicants who were strong in one or more areas.

195. A noticeable and glaring omission from this short list of requirements is the "immediate danger" category. Unfortunately, example after example CCW application can be provided which refutes that "immediate danger" has anything to do with whether or not an applicant receives a CCW; applicants with chilling and compelling reasoning were denied, while those who wanted to deter vandals on their large properties were approved. The applications referred to hereafter are a template for the CCW applicant who wants to be assured of having his application approved. They are representative of those who in some fashion provided campaign

Case 2:08-cv-02064-JAM-KJM Document 1560 Filed 11/26/2009 Page 39 of 64

contributions to Defendant Blanas (and some to Sheriff McGinniss too), then applied for and received a CCW.

196. Preliminarily, a CCW is good for only 2 years, and thus must be renewed. Therefore, the following CCW permit holders received a CCW during the period of time Defendant Blanas was in office because all records prior to 2003 have been destroyed, except for "current" permit holders. Also, most of the same individuals that contributed to Defendant Blanas, contributed to Sheriff McGinniss when Sheriff McGinniss was Undersheriff. For example, Twomey Exhibit "J-1", Page shows Capitol Steele (Abrate), D. Bruce Fite & Associates and Fite Properties, Inc. (Fite and Halimi), Energetic (Gerber), and Dettling. Thus, there is a continuity in the pattern of contributions as will be demonstrated below. Also, as will be shown, Fite's, Halimi's and Gerber's applications were all approved during the Blanas/McGinniss transition (Gerber by Blanas, and the others by McGinniss). These three are contributors to both Blanas and McGinniss.

197. Edwin Gerber owns what appears to be a million dollar vacation home in Reno with Defendant Blanas (See Twomey Exhibit "K"), and contributes to his campaign under Energetic Drywall (See Twomey Exhibit "J", Page: 171), which is reported in campaign disclosure records under the penalty of perjury. Gerber's individual contributions were not reported as noted in the campaign records though Defendant Blanas testified that Gerber personally donated money (there is always the possibility that I missed it, but I did review all of Blanas' campaign records several times, and never once saw "Gerber's" name). Defendant Blanas also personally approved Gerber's CCW application.

198. Gerber stated in his justification that he carries large sums of cash and wears expensive jewelry. More specifically, "Carry large sums cash $4000-$5000 wear $45,000 watch + rings - expensive jewelry". Twomey Exhibit "D", Page: 7. Defendant Blanas personally

"approved" this so-called "verbal" application on July 26, 2007, even though a "written" application was submitted on July 25, 2006. Compare Twomey Exhibit "D", with the dates on pages 1, 2, 3, and 10; Pl. Exh. "A", Blanas Depo. 46:7-16, 47:9-48:25, 55:11-18, 63:14-67:7; Pl. Exh. "1"; Pl. Exh. "B", Wong Depo . 87:6-22; 85:22 thru 86:20; 62:7-25 thru 63:1-10; see also Exhibit E; Pl. Exh. "A", Blanas Depo. 46:7-16, 47:9-48:25, 55:11-18, 63:14-67:7; Pl. Exh. 5; Pl. Exh. "B", Wong Depo Wong Depo . 79:22-25 thru 80:1-20, 83:11 thru 85:7. 61; Twomey Exhibit "J", Page: 171 (Energetic Painting and Drywall, Inc.)

199. It was not until this case that I had ever heard or read of the terms "verbal application" for a CCW and "emergency CCW." See Twomey Exhibit "D", Page: 2. I have never read or ever heard of this policy, nor am I aware of any statute providing for such. To the contrary, everything I have heard, read, and studied regarding CCWs indicates that there must be a signed application AND review of the standard DOJ State Application, attached hereto as Twomey Exhibit "B". At a minimum, this precludes those with mental problems and criminal histories from being authorized by the Sheriff to carry a concealed weapon.

200. Ernest Martini a.k.a. Ernest Martini contributed to Defendant Blanas's campaign, and received a CCW for the following stated reason: "I routinely check on properties that are located in high-crime areas throughout California." Pl. Exh. "A", Blanas Depo. 83:2-84:24, 88:2-20; Twomey Exhibit "J", Page: 108 [Martini Associates Property Management]; Twomey Exhibit "D", Page: 9-11; See Twomey Exhibit "I", Page: 5; see also Bate Stamp #D 01694, D 01725, D 02012.

201. Ben Upton a.k.a. Benjamin Upton, a contractor (Valley Painting at Twomey Exhibit "J", Page: 82) in Elk Grove, contributed to Defendant Blanas's campaign and received a CCW. Twomey Exhibit "D", Page 12; Pl. Exh. 3, Pl. Exh. "A", Blanas Depo. 68:10-69:2, 76:15-23, 91:22-25; Twomey Exhibit "J", Page: 34 (Valley Painting), 113. As noted on Upton's CCW

Case 2:08-cv-02064-JAM-KJM Document 60 Filed 10/16/2009 Page 41 of 64

application, his business name is “Valley Painting”, at and page 13 he states that he “**[has] not had a problem**”, **“[has] never had any incidents**”, and “**[has] never been threatened**”, which is all conclusive that there was no “immediate” threat or harm for the issuance of his CCW.

202. Jim Anderson a.k.a. James Anderson owner of Pacific Coast Building Products, Inc., is a major contributor to Defendant Blanas' campaign by the way of "forgiven loans" [D 01807, 01796, 01647], and received a CCW commencing in 1994; his CCW application is missing. Pl. Exh. "A", Blanas Depo. 68:10-69:2, 77:8-9, 83:2-84:24, **84:21-85:12**; Pl. Exh. 3; Twomey Exhibit “J”, Page: 19, 37, 180. However, what is really important here is that a “Michael Gilmore” (issued 2003) and “Richard Merri” (issued 1998) both have CCWs, and both just happen to work for “Pacific Coast Building Products, Inc.” which also just happens to be one of the major campaign contributors to Defendant Blanas. Twomey Exhibit “D”, Page: 15, 16.

203. In particular, the only conclusion I can draw from why both of these individuals were issued CCWs was because they were employed by Anderson’s company since the name of the company is the only common denominator, and no other information was provided. Again, here is a pattern of minimal information, no threat of immediate danger as required, and the only common denominator is a business associated with a major campaign contributor.

204. Jack Kimmel contributed to Defendant Blanas's campaign, and received a CCW even though on his application it said "self defense" and "self defense" is NEVER justification for issuance of a CCW based upon Defendants purported criteria (i.e. written policy). Campaign contributions were through Jack Kimmel Construction Company and "Sacramento Rendering." Pl. Exh. "A", Blanas Depo. 50:7-12, 50:24-51:5, 70:17-71:5, 88:6-8. Twomey Exhibit “J”, Page: 11, 58, 129 (Sacramento Rendering); Twomey Exhibit "D", Page: 17-19.

205. Likewise, Michael Koewler contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 68:10-69:2, 71:12-17, 88:6-9. Twomey Exhibit

Case 2:08-cv-02064-JAM-KJM Document 15 Filed 01/21/2009 Page 42 of 64

"J", Page: 11, 107, 176 Like Jack Kimmel, he also is a business owner with Sacramento Rendering, which contributes large amounts of money to Blanas (See Bate Stamps D02071, 01898, 01660, etc.). Twomey Exhibit "D", Page: 20-21. Significantly at page 20, the word "other" is checked, in leu of "threats", "money", "late hours", "types of work", "law enforcement." As this was a pre-1999 form, its format is much less sophisticated.

206. However, what is important to note is the CCW was issued "**PER SHERIFF CRAIG 06-10-97**". Twomey Exhibit "D", Page: 20. Then, somehow, at Twomey Exhibit "D", Page: 21, the State wide CCW application was used, and all the other pages are missing, and by comparing Defendants' bate stamp numbers, these documents were not even grouped together, but just thrown into a random stack of thousands of other pages of other CCW applications. Therefore, since documents must be produced in the order in which they are maintained, this documents were pulled from separate locations.

207. Next, a Kurt Halverstadt was issued a CCW on 6/13/2003; his application was "**APPROVED FOR ISSUE UNDERSHERIFF JOHN MCGINNIS 6-13-03**", and as noted on the same page "Lou Blanas" was "Sheriff." Twomey Exhibit "D", Page: 22. As noted at Twomey Exhibit "D", Page: 30, Halverstadt's justification for a CCW was that he handles "assets of significant value" and the "high visibility of being part of The Sullivan Group" and that it is "a reasonable business precaution." See also, Twomey Exhibit I, Pages: 12-13. Again, no immediacy, and no specific threats.

208. If the standard for approval is "a reasonable business precaution", then most business owners should be issued CCWs. However, the law is clear: one may have a firearm in their place of business, thus a CCW is not needed. What was obvious to me immediately was that Tom Sullivan of The Sullivan Group has a close line of communication with the Sheriff, and this cannot be disputed for Sheriff McGinniss himself appeared frequently on Tom Sullivan's

program before Sullivan left for the national spotlight. I have personal knowledge in that I know Sheriff McGinniss, I recognize his voice, and I listened to Sheriff McGinnis personally speak many times on Tom Sullivan's program. The three panel committee was completely bypassed - again, similar to Gerber and Koewler.

209. Then, after McGinniss becomes Sheriff, you see the same pattern – the Sheriff getting personally involved in the CCW approval process for select individuals.

210. David Bruce Fite was issued a CCW on 1/23/2007. Pete Halimi was issued a CCW on 1/2/2007. Both are either employed by or had a business interest in D. Bruce Fite & Associates, Fite Construction & Development Co., and Fite Properties, all registered at 9857 Horn Road, Sacramento, CA 95827, at the time the CCW was issued, and campaign contributions under were made under various company names of D. Bruce Fite & Associates, Fite Construction & Development Co., and Fite Properties. See, for example, Twomey Exhibit "J", Page: 54, 145, 173; Twomey Exhibit "D", Page: 33.

211. Twomey Exhibit "D", Pages 31-shows "John McGinniss" (Sheriff now) personally overruling the so-called three panel CCW committee by approving two almost identical applications principals (Fite and Halimi) of the business known as "Fite Development", "Fite Construction", or "Fite Properties, Inc." located on "Horn Road." Twomey Exhibit "J", Page: 54, 145, 173; Twomey Exhibit "D", Page: 33. The first thing that really caught my attention, besides McGinniss himself personally overruling his own appointed committee and approving CCWs is that both of these individuals are identified as members of the "SSD AERO SQUAD" right on the CCW evaluation cover sheet.

212. I know from my management experience that the County of Sacramento Sheriff's Department started the "Air Support Bureau" in the late 1970s or early 1980s. The helicopters are referred to as STAR units (Sheriff's Tactical Air Resource).

213. This is significant because I have been a member of the Sacramento Sheriff's Department (SSD) for 32 years, retiring in July of 2004, and I have never heard of or even seen any organizational chart for the SSD Aero Squad, short for the Sacramento Sheriff's Department Aero Squadron, though I note that the Sacramento County Sheriff's Aero Squadron is purportedly located at 711 G Street and donated to Defendant Blanas' campaign. Twomey Exhibit "J", Page: 14.

214. The problem with this Aero Squad is that, in 1999, I was a manager with the Department and no such organization ever existed at 711 G Street, headquarters for my employer at the time. See Twomey Exhibit "J", Page: 14. More importantly, had I known that a branch or department of government existed that donated money to a political campaign, I would have immediately commenced an IA investigation pursuant to the General Orders requiring me to report a suspected crime or violation of law.

215. Next, what also really struck me as suspicious, and maybe why David Fite's application was originally denied was the fact that the evaluation form (Twomey Exhibit "D", Page: 31, see also 33) states that Fite is "Retired." But then, under the penalty of perjury, Fite apparently states that "Applicant carries large amounts of cash from business to the bank for deposit." I asked myself, "if he is retired, why is carrying cash from business to the bank?" As a trained investigator, I would definitely question his application, and there should be notes explaining this very inconsistent statement. Instead, the Sheriff just approves the CCW with no investigation from what I can determine from the Department's own business records.

216. Halami's evaluation form has him listed as a "real estate developer". Twomey Exhibit "D", Page: 37, 43; See Twomey Exhibit "I", Page: 7. If it is true that the three panel committee reviews just what is in the application and the justification for issuance, then how is it that the "CCW BRIEFING SUMMARY" prepared by Amber Wong contains facts that are not in

the application. Pl. Exh. “B”, Wong Depo . 31:17-41:13. For example, here, Halami’s actual application provides the stated reason for a CCW is that he “**carries cash from business**.” Twomey Exhibit “D”, Page: 45. However, at Twomey Exhibit “D”, Page: 39, Amber Wong writes “Applicant carries large amounts of cash home from the business located in Rancho Cordova. He also works late hours and <u>feels vulnerable</u>.” [emphasis added] However, Halimi’s real estate license has his business located in Carmichael, CA, not Rancho Cordova. See Twomey Exhibit “I”, Page: 7. Since there are no notes or other documents in Halimi’s file, where did this additional information come from?

217. In 2002, Richard Hill a.k.a. Dick Hill had his application approved by Undersheriff McGinniss after it was denied by the three member panel, and his Section 7 justification is blank. Twomey Exhibit “D”, Page: 47-49, 57. However, someone else fills in that the “Applicant’s permit has expired and he failed to renew in a timely manner. “Applicant makes bank deposits for Lexus of Sacramento and responds to alarm calls for the business.” Twomey Exhibit “D”, Page: 50. Again, another person associated with the owner of a company that contributes and also has a CCW.

218. Bob Frink HEAVILY contributed by way of forgiven loans to Defendant Blanas's campaign, and received a CCW, plus he is a "friend" of Defendant Blanas. Pl. Exh. "A", Blanas Depo. 83:2-84:24, 86:8-14; Twomey Exhibit “J”, Page: 8, 19, 37, 96, 193 (RPM Management); Pl. Exh. “3"; Twomey Exhibit “O”, D_01593. Robert Frink is also the owner of RPM management, which also just happens to employ Richard Hill, and a Patrick Frink is also affiliated with Bob Frink Imports, all at the same business address. See Twomey Exhibit “I”, Page: 9, 10, 11 and compare with Twomey Exhibit “I”, Page: 48, 49, 50, noting that RPM Management and Lexus of Sacramento are operating all out of Robert Frink’s Madison Avenue address.

Case 2:08-cv-02064-JAM-KJM Document 156 Filed 10/16/2009 Page 46 of 64

219. Patrick R. Frink was issued a CCW on 2/24/2000, and Robert Frink was issued a CCW on 5/18/1995. Both of these individuals were either employed by or had a business interest in Bob Frink Imports, Inc, Bob Frink Management, Inc., RPM Management, all located at 5112 Madison Avenue, Suite 201, Sacramento, Ca 95841. These various individuals and entities are identified in CCW records and on campaign contribution records. See Twomey Exhibit “I”, pages 9-11, and Twomey Exhibit “O”.

220. Likewise, these records also identify a Richard Gord Hill that was issued a CCW on 9/6/2000, and that Richard Gord Hill was either employed by or had a business interest in Bob Frink Management, Inc. and RPM Management, 5112 Madison Avenue, Suite 201, Sacramento, CA 95841, at the time the CCW was issued.

221. Ronald Yee, a dentist, contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 83:2-84:24, 92:3-6; Twomey Exhibit “J”, Page: 14, 83, 114; Twomey Exhibit “D”, Page: 59-60. His stated reason is essentially that “there is a real possibility of encountering life threatening situations when out alone on the street or in my parking lot.” Clearly, there was no stated immediate threat. Twomey Exhibit “D”, Page: 60.

222. Both John and Steve Raptakis have CCWs, and John Raptakis contributed to Defendant Blanas's campaign under J. R. Painting & Waterproofing at Vintage Park Drive. See Twomey Exhibit “I”, Page: 8; Twomey Exhibit “D”, Page: 61, 62, 63, 64; Twomey Exhibit “J”, Page: 39; Pl. Exh. "A", Blanas Depo. 68:10-69:2, 77:16-78:1, 91:2. Again, the justification for issuance was essential self defense from garden variety working in “dangerous neighborhoods”.

223. Now, compare Raptakis’ applications with Attorney Rothery’s and Plaintiff Lau’s, and it becomes that even a perceived threat by a campaign contributor is good enough reason to obtain a CCW, and others who have not contributed are denied even though they have more compelling so-called perceived “threats”.

224. John Valensin contributed to Defendant Blanas's campaign, and received a CCW, and the reason for his application was defense of property from trespassers (it is illegal to use deadly force to protect property). Pl. Exh. "A", Blanas Depo. 18:6-14, 21:2-15, 24:4-9, 76:17-23; Pl. Exh. 2 and 3; Twomey Exhibit “D”, Page: 65; Twomey Exhibit “J”, Page: 36, 38, 113.

225. Ron Sellers contributed to Defendant Blanas's campaign, and received a CCW for what would constitute everyday dangers, not unusual to the average employer. Pl. Exh. "A", Blanas Depo. 18:6-14, 21:2-15, 24:4-9, 91:4-6; Twomey Exhibit “D”, Page: 66-67; Twomey Exhibit “J”, Page: 12, 38. 79. Here, all of Sellers’ concerns involve dangers at work and at his residence; places where he is already legally allowed to arm himself without a CCW; as stated in the form letter of rejection to other CCW applicants. Likewise, Jack Sellers contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 18:6-14, 21:2-15, 24:4-9. Steve Sellers contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 18:6-14, 21:2-15, 24:4-9. Their applications, however, are missing, though they appear to be appointed Level III reserve deputies, which is just a political appointment since at the time they would not have to been POST certified.

226. However, the application of Roman Thorntona is really interesting as he is the personal assistant for Ron Sellers. Twomey Exhibit “D”, Page: 68. Thorntona requested a CCW to guard Sellers, but Seller’s can guard himself since he too has a CCW. Again, not only does the proprietor of a business who contributes heavily to the Sheriff obtain a CCW upon application, but those closely associated with this contributor are approved as well (i.e. Halami with Fite; Hill with Frink; Gilmore and Merri with Anderson; Koewler with Kimmel; and now Thorntona with Sellers, not to mention the other two Sellers as well; then there are the two Raptakis; and Halverstadt with Sullivan/McGinniss).

227. From there, it just goes on. Dave Baker, carpet business, contributed to Defendant

Blanas's campaign, and received a CCW, and his application was "approved Chief Dan Lewis", and bypassing the so-called committee altogether with undocumented threats. Twomey Exhibit “D”, Page: 76-78; Plaintiffs' Exhibit D. Pl. Exh. "A", Blanas Depo. 23:20-25, 24:4-9, 26:19-20, 68:10-69:2, 69:10-13. Twomey Exhibit “J”, Page: 138.

228. Dr. Pasquale Montesano contributed to Defendant Blanas's campaign, and received a CCW for responding to emergencies “at late hours”. Twomey Exhibit “D”, Page: 79 [also, 83 is part of 79, they are out of order]; Pl. Exh. "A", Blanas Depo. 83:2-84:24, 89:11-90:11; Twomey Exhibit “J”, Page: 61.

229. Chris Hansen, of Chris Hansen Insurance in Elk Grove, contributed to Defendant Blanas's campaign, and received a CCW in 1998, though the committee sheet says denied for “no compelling reason” and it was then subsequently approved as a “renewal” in 1999 - the only statement made being “personal safety due to my business” and he had a CCW in San Luis Obispo, CA. Twomey Exhibit “D”, Page: 81, 82, 124. Pl. Exh. "A", Blanas Depo. 68:10-69:2, 69:23-70:4, 83:2-84:24, 86:21-4; Twomey Exhibit “J”, Page: 23, 71, 167, 168.

230. John Christie employs Nanette Blanas (a woman whom I know to be Defendant Blanas’ wife), and both of these individuals also work in the same office as Angelo Tsakopoulos (i.e. AKT Development) whose name and company contributes heavily to Defendant Blanas. See Twomey Exhibit “I”, Page: 1-3. For example Twomey Exhibit “J”, Page: 17, $25,000.00 “forgiven loan” with the same business address, and this pattern is repeated throughout Defendant Blanas’ campaign records. John Christie had his CCW approved in October of 1998, and the $25,000.00 loan was forgiven by 1/11/99. No other information is provided on Twomey Exhibit “D”, Page: 84. However, at Twomey Exhibit “D”, Page: 85, John Christie describes his place of employment as “Sunrise Liquors” on Greenback Lane, but his real estate license has him listed at 7700 College Town Drive, Suite 101, the same identical address and suite as Angelo

Tsakopoulos.

231. On the face of the application, and the only basis for approval is “carry large amounts of cash to the bank three to four times a week. Also work at the above business often times late.” Twomey Exhibit “D”, Page: 85. It is also noted that 10 years prior, in “1988", he was denied a CCW, which also happens to be 10 years after he incorporated “Sunrise Liquors, Inc.” on 4/7/1978. Twomey Exhibit “N”. Likewise, John Christie’s wife also applied for, and received a CCW for the same purported reason. Twomey Exhibit “D”, Page: 88-89.

232. Chris Lee, an “attorney/farmer” contributed to Defendant Blanas's campaign, and received a CCW in 1996. Pl. Exh. "A", Blanas Depo. 68:10-69:2, 71:7:12, 88:6-8; Twomey Exhibit “D”, Page: 92-93. Not only does Lee’s application establish no “documented” threats, it is specifically stated in his application that he “lives in rural area of county - often confront trespassers on my ranch.” Here, Lee’s application makes clear that he wants to use deadly force to protect property. Twomey Exhibit “D”, Page: 93.

233. James Grey contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 83:2-84:24, 87:19-23. Twomey Exhibit “J”, Page: 9, 26, 75, 93; See Twomey Exhibit “I”, Page: 6; Twomey Exhibit “D”, Page: 94. Again, no specific threats, just a generalized feeling of vulnerability, but more importantly, it was emphasized that there was the potential for bank managers to be kidnaped or extorted, with no specific threat towards him.

234. Hatim Shariff contributed to Defendant Blanas's campaign, and received a CCW for protection of business (i.e. Shariff Financial Corporation has three jewelry stores in Sacramento.” Pl. Exh. "A", Blanas Depo. 68:10-69:2, 76:2-7, 91:1-3; Twomey Exhibit “D”, Page: 96-97.

235. Julie Rollofson contributed to Defendant Blanas's campaign, and received a CCW, plus her father Dr. Rollofson also donated to Defendant Blanas's campaign [this was established by Julie Rollofson listing her father as her employer on her CCW Application and Dr. Rollofson's

Case 2:08-cv-02064-JAM-KJM Document 56 Filed 11/16/2009 Page 50 of 64

address matches on the campaign records.] Twomey Exhibit “O”, D_01563; Pl. Exh. "A", Blanas Depo. 68:10-69:2, 77:13-78:1, 91:2; Pl. Exh. 2; Twomey Exhibit “D”, Page: 98-99; Twomey Exhibit “J”. Most importantly, she was “denied” for “no compelling reason”, but then it is written, “O.K. permit do amend review if status changes Chief B Roberts.” Again, the so-called committee is overruled by a higher authority.

236. Alvin and Gary Ricci contributed to Defendant Blanas's campaign, and received a CCW, and the records were destroyed by SIB. Pl. Exh. "A", Blanas Depo. 68:10-69:2, 75:1-2; Pl. Exh. 2; Twomey Exhibit “J”, Page: 20, 68, 86; Twomey Exhibit “D”, Page: 100-102. The application merely mentions the name of Ricci’s business, and that is it.

237. Kermit Schayltz, owner of Lucky Derby Casino, was issued a CCW in 1996 for “course of business - to and from bank.” with only two members present on the three member review panel. Twomey Exhibit “J”, Page: 28, 59, 76, 94, 151 (Point Walker, Inc. dba Lucky Derby Casino), 196; Twomey Exhibit “D”, Page: 103-122. Interestingly, a person who has had a CCW since 1996, is suddenly denied in 2007 by McGinniss, apparently because Schayltz did not contribute to McGinniss’ campaign.

238. The important point is that this individual has been operating the same business for years, and is eventually denied a CCW for the same reason one was approved. At a minimum, this shows an arbitrary and capricious policy with absolutely no standard for the reviewing committee members to abide by. Then, for Gerry Harris, he has a CCW and no application was provided, and he too is believed to be affiliated with Lucky Derby. Twomey Exhibit “J”, Page: 56, 194, 196 (Point Walker/Lucky Derby); Twomey Exhibit “O”, D_01561.

239. Bill Myers, "the Padillas" (i.e. Alejandro, Anselmo, Greg, Jess, Michael a.k.a. Padilla Bail Bonds) contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 68:10-69:2, 74:21-25. More importantly, here again, the “SSD Air Squadron”

Case 2:08-cv-02064-JAM-KJM Document 60 Filed 11/21/2009 Page 51 of 72

is named as the only justification for issuance in 1997. Twomey Exhibit “D”, Page: 123, 133; Twomey Exhibit “J”, Page: 21, 78; Pl. Exh. 2 and 3. One of the Padilla’s states “self protection” with no immediate threats. Twomey Exhibit “D”, Page: 133.

240. Dave Mastagni contributed to Defendant Blanas's campaign, and received a CCW in 1989 for “course of business”. Twomey Exhibit “D”, Page: 134; Pl. Exh. "A", Blanas Depo. 68:10-69:2, 72:16, 88:6-8; Twomey Exhibit “J”, Page: 40, 60, 109. I know David Mastagni personally, been to his office, sought legal advice from him, and at no time did I ever perceive that Mastagni was ever in any danger working in his law office, nor was his office ever located in a high crime area.

241. Bill Spurgin gave Defendant Blanas jewelry, donated to his campaign and received a CCW, and his CCW is a non-law enforcement CCW issued in 1996 and is still current. Pl. Exh. "A", Blanas Depo. 68:10-69:2, 76:8-14.

242. Joseph Mohamed, Asghar Mohamed, Ahmed, and John Mohamed were issued CCWs in 2001, 2005 respectively, and their files were purged, and Joseph is a very heavy contributor to Defendant Blanas. Blanas Depo Exhibit 1, 2 and 3, Twomey Exhibit “J”, Page: 10, 12, 27; Twomey Exhibit “D”, Page: 125-132. Of particular interest is that he too is a real estate broker and property manager, collecting rents. The application states: “My concealed weapon has provided me with a sense of security in these situations.” (126) It is noted that basically no reason was provided for the others.

243. Attorney John Virga contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 68:10-69:2, 76:15-23; Twomey Exhibit “J”, Page: 57; Pl. Exh. 2, Twomey Exhibit “O”, D_01574.

244. Margaret A. Abrate of Capitol Steel, Co. contributed to Defendant Blanas's campaign and received a CCW. Twomey Exhibit “J”, Page: 47, 70, 102, Twomey Exhibit “O”,

Case 2:08-cv-02064-JAM-KJM Document 56 Filed 10/21/2009 Page 52 of 64

D_01609.

245. John Morgan contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 83:2-84:24, 89:1-6. Twomey Exhibit “J”, Page: 28, 78, 109, Twomey Exhibit “O”, D_01551.

246. Jerry a.k.a. George Brannigan contributed to Defendant Blanas's campaign commencing in 1995 or 1999, and received a CCW. Pl. Exh. "A", Blanas Depo. 18:6-14; 21:2-15. Twomey Exhibit “J”, Page: 5, 19, 37, 95, Twomey Exhibit “O”, D_01591.

247. Jack Kearns a.k.a. John Kearns contributed to Defendant Blanas's campaign, and received a Non-peace officer CCW. Pl. Exh. "A", Blanas Depo. 67:9, 70:9-16, Twomey Exhibit “O”, D_01538.

248. Bill Mosier contributed to Defendant Blanas's campaign, and received a CCW. Pl. Exh. "A", Blanas Depo. 25:17-25, 26:23-25; Twomey Exhibit “O”, D_01596.

249. A CCW was issued on 8/28/93 to Steve Beneto of Beneto Petroleum Products whom also forgave a $15,000.00 loan to Defendant Blanas. Twomey Exhibit “J”, Page: 4, 19, 37, 95; Twomey Exhibit “O”, D_01636.

250. On 8/12/1998, Spencer Bole was issued a CCW and contributed to Defendant Blanas’ campaign in 1999. Twomey Exhibit “J”, Page: 5, 50, 87. Twomey Exhibit “O”, D_01636.

251. John Manikas was issued a CCW October 1994, and contributed to Blanas’ campaigns under Color Core Incorporated and Five Star in 1999. Twomey Exhibit “J”, Page: 6, 23, 88, 92 [$25,000], 96, 108. Twomey Exhibit “O”, D_01604.

252. Dave Commons was issued a CCW in 1996, and contributed to Blanas’ campaigns. Twomey Exhibit “J”, Page: 23; Twomey Exhibit “O”, D_01577.

253. David S. Smith, Eagle Ridge Construction was issued a CCW October 1994, and

Case 2:08-cv-02064-JAM-KJM Document 60 Filed 11/16/2009 Page 53 of 64

contributed to Blanas' campaigns. Twomey Exhibit "J", Page: 24, 72, 104. Twomey Exhibit "O".

254. Ed Rincon was issued a CCW 1997, and contributed to Blanas' campaigns. Twomey Exhibit "J", Page: 25, 53, 73. Twomey Exhibit "O", D_01573.

255. Doug Barkdull was issued a CCW, and contributed to Blanas' campaigns. Twomey Exhibit "J", Page: 49, 101; Twomey Exhibit "O", D_01609.

256. Darrell Dettling was issued a CCW in 1994, and contributed to Blanas' campaign in 1999. Twomey Exhibit "J", Page: 7, 24, 52, 72, 103, 170; Twomey Exhibit "O", D_01601.

257. My attention was also directed to Defendant Blanas being deliberately evasive in responding to questions regarding who he issued a CCW and Honorary Badges to and who contributed to his campaigns, with coaching by his attorney. Pl. Exh. "A", Blanas Depo. 23:15-25:24, 29:13-30:21, In fact, at one point, Defendant Blanas deliberately lied about his ownership of a million dollar vacation home in Reno with CCW and campaign contributor Edwin Gerber, then he changed his mind on the subject. Pl. Exh. "A", Blanas Depo. 46:7-16, 47:9-48:12.

258. Moreover, take Twomey Exhibit "J", Page: 115, this is a list of outstanding loans to Defendant Blanas in the year 2001, and out of nine loans, two of which are by the same individual under different companies (i.e. Manikas with Color Core and Five Star Services), so there are only eight individuals. Of these eight, five have CCWs (Beneto, Brannigan, Manikas, Cummings, and Frink), one indirectly employs Defendant Blanas' wife (Angelo Tsakoploulos through Christie), and one sold a house to Defendant Blanas and Gerber, who is a Co-owner and also just happens to have a CCW. This is just an example of what the volumes of documents show.

259. In fact, it is more likely than not that on every page one will find at least one CCW permit holder who has contributed to Defendant Blanas' campaign. For instance, Twomey

Exhibit "J", Page: 119, 2 of 3 have CCWs (i.e. Beneto and Brannigan) and the third sold a house to Defendant Blanas (i.e. Bardis) See Twomey Exhibit "K", Page: 1. At Twomey Exhibit "J", Page: 120, 4 of 5 have CCWs (Brannigan, Manikas under Color Core and Five Star, and Frink). Then, at Twomey Exhibit "J", Page: 121, 3 of 5 have CCWs (Jack, Ron, and Steve Sellers). There is also a Manolakas that has a CCW and it is more likely than not under a totality of circumstance that this person is related. Then, Twomey Exhibit "J", Page: 122, 1 of 2 individuals has a CCW (Valensin), and the other (Tsakopoulos indirectly employs Defendant Blanas' wife).

260. My analysis does not just stop there. The application of Roland Lewis (Twomey Exhibit "O", D_ 01561) is particularly puzzling because here is a man that has absolutely no records connecting him to any company or individual, and he was issued a CCW for "Self protection Bus related", a reason that is more cryptic than anything. This is a very good example of the capriciousness and arbitrariness that Plaintiffs, at a minimum, were subjected to.

261. Next, I compared applications of those who were approved CCWs with those who were denied, noting that most applications of "current" holders of CCWs were either not turned over or are missing pages; those that were provided, most of the documents associated with the application itself are missing, such as the "CONCEALED WEAPONS PERMIT EVALUATION" (For an example of one provided in an denied application, see **Exhibit "8"** D_01067), the "CCW BRIEFING SUMMARY" (See **Exhibit "8"** D_01068)

262. Attached hereto as Twomey Exhibit "D", Page 2 (Plaintiffs' Exhibit "E"), is a letter from Defendant himself to a Mr. Edwin Gerber, and man who Defendant Blanas not only owns a vacation home with, but also has received campaign contributions from. Mr. Blanas acknowledges that a so-called "verbal" application for a CCW was made directly to himself, and that he approved the CCW. Blanas testifies in his deposition that he owns a house with Gerber, that Gerber personally, and through his company contributed to his political campaign, and the

attached Twomey Exhibit “K” and Exhibit “M”, a true and correct copy of official assessor records of Nevada, showing the Gerber and Blanas ownership interest in the house.

263. Further, there is no objective criteria. As such, it is subject to abuse on its face.

264. In sum, this pattern is consistent throughout, just compare any name in Twomey Exhibit “J”, Pages: 1-249 with the list of CCW permit holders markes as Plaintiffs’ Exhibits 1, 2, and 3, and Twomey Exhibit “O”, and it becomes obvious.

265. Therefore, based upon my education, training and experience, and to a degree of reasonable certainty, I can state that Defendants CCW permit process is wrought with capriciousness and arbitrariness, and continues till this day.

266. I further opine, based upon my education, training and experience, and to a degree of reasonable certainty, that Plaintiffs were denied an equal and fair opportunity to receive a CCW as compared to those who received CCWs.

267. I further opine, based upon my education, training and experience, and to a degree of reasonable certainty, that Plaintiffs were denied equal opportunity under the law to receive a CCW from Defendants.

268. I further opine, based upon my education, training and experience, and to a degree of reasonable certainty, that selective issuance of CCWs to those with close affiliation to the Sheriff (i.e. elected official) is a systemic problem that is inherent in a system whereby money influences those with the “power” to issue CCWs, which in this case, is the Sheriff of Sacramento County.

269. I further opine, based upon my education, training and experience, and to a degree of reasonable certainty, that what this evidence demonstrates is that those who have access to the Sheriff indeed have a very high probability of receiving a CCW, if they apply for one, as compared to a very low probability for those who do not have access to the Sheriff, nor

contributed to his campaign, such Plaintiffs.

270. I further opine to a degree of reasonable certainty, that Plaintiffs Mehl and Lau did not receive equal treatment for the review, if any, of their CCW applications since they did not contribute or have any relationship to then Sheriff Blanas or then Undersheriff McGinniss. I can state to a degree of reasonable certainty that both Plaintiffs CCW applications were denied simply because they were not known contributors to Sheriff Blanas' political campaigns for Sheriff, and his Undersheriff's quest to become sheriff. This is what the evidence shows.

ACTIVE AND HONORABLY RETIRED MEMBERS OF THE CRIMINAL JUSTICE SYSTEM

271. There is no supporting data as to why all active or honorably separated member of the criminal justice system directly responsible for the investigation, arrest, incarceration, prosecution or imposition of sentence on criminal offenders are provided preferential treatment for the issuance of a CCW. See Twomey Exhibit "J", responses 17-27. In fact, no research was done determining what members of society were more inclined to be victims of crime (i.e. geographic location, race, gender, etc.) Therefore, the policy is flawed from the start since there was no effort to determine if certain demographics or variables are present in order that certain citizens are more inclined to be the victims of crime, thus requiring a CCW more so than others.

272. Also, the Defendants, when implementing the purported CCW written policy, relied upon absolutely no data or facts as to what constitutes good cause. See Exhibit "J", Defendants responses to requests 17-27. There is absolutely no evidence supporting a prima facie good standard for issuance of a CCW to honorably retired peace officers of individuals who are or were members of the criminal justice system. In fact, I am unaware of any off-duty or retired officer being subjected to crime at a greater rate than other members of society.

273. Based upon the totality of evidence, including the opined abuses noted above and

Defendants admitted lack of research or evidence supporting the prima facie good cause policy, it is my opinion to a degree of reasonable certainty that the prima facie good cause standard lacks any merit or support, and creates a separate privileged class of citizens who are rewarded for their affiliation with law enforcement.

274. I am not aware of any specialized training in the criminal justice system for determining what constitutes cause for issuance of a CCW.

275. In fact, I have never even heard of any policy debates or issues regarding how, when and why CCWs should be issued.

276. However, it is well known throughout the Sheriff's Department that CCW, Honorary Deputy Badges and IDs were given to Craig's and Blanas' campaign contributors.

277. In sum, it is my opinion, based upon a degree of reasonable certainty, that the CCW policy of the Sacramento County Sheriff's Department, as both written and unwritten, is applied in a discriminatory, unfair, biased, prejudicial, and capricious manner, and that there is obviously extreme favoritism towards two distinct groups, to the exclusion of all other citizens of Sacramento County: 1) those with political influence and ties (e.g. campaign contributors and other who can contact the Sheriff directly and receive CCWs, Badges, and I.D.s.) and, 2) "active or honorably separated member of the criminal justice system directly responsible for the investigation, arrest, incarceration, prosecution or imposition of sentence on criminal offenders" are also provided preferential treatment (i.e. the prima facie good cause standard for issuance)

RESIDUAL OPINIONS

278. It is my understanding that Plaintiff Lau is a former FBI Agent who was adjudicated with a PTSD work disability due to his long time undercover operations in hostile foreign Countries as a Counter-Intelligence FBI Agent, which included extensive polygraph exams to which no other CCW applicant/campaign contributor underwent in all likelihood. This is

undisputed. Mr. Lau in all likelihood possessed a security clearance that far exceeded any background investigation conducted on any CCW permit holders and Sacramento County employee, including myself. There is no doubt of the danger to his life from hostile foreign Governments and local gangs and criminals, greater than any other person from any CCW application I reviewed. Mr. Lau's application was rejected because, according to Defendants, he had not established "good cause" that there was a threat to his life – no other reason was provided to Mr. Lau (See Loch Lau's Declaration).

279. I compared this with some of the other applicants who donated money or provided forgiven loans, and it was disturbing that these individuals were issued CCWs for such reasons as "Self Defense" (2465, 2471, 2482, 2500), carrying cash and wearing expensive jewelry (Gerber), and defending property (again, it is illegal to used deadly force to defend property). Also, CCWs were issued for which no application exists.

280. Plaintiff Mehl, a first class citizen with no prior contact with law enforcement, was not even contacted by the Defendants, though section 7 of the State DOJ form application required an "interview". In sum, Mr. Mehl's application was completely ignored.

281. Both Plaintiffs have never contributed money to any local sheriff's campaign.

282. All things being equal, the proportion of rejections for campaign contributors would be about equivalent. However, the only variable to change is that those who received a guaranteed CCW were also campaign contributors.

DEFENDANTS DECLARATIONS AS EVIDENCE

283. The Declarations submitted by campaign contributors and/or these within Blanas, inner circle further support my opinions expressed herein for the following reasons:

284. Mr. Foondos states he received an Honorary Badge personally from then

Sheriff Blanas, and that he was able to physically approach then Sheriff Blanas and ask for a CCW.  There is a Mr. Foondos on Defendant Blanas' campaign records.  Mr. Foondos deliberately avoids stating his relationship to Mr. Blanas.  Most importantly, he did NOT submit a CCW application.  Neither one of the Plaintiffs had this type of access to the then-Sheriff Blanas.

285.  Mr. Beutler states that he was able to physically approach then Under-Sheriff Blanas and ask for a CCW, and again as Sheriff.  He never submitted an application, though Sheriff Blanas has approved CCWs for so-called "emergencies." (e.g. Ed Gerber case in point.)  Campaign records clearly reveal that Mr. Beutler is a campaign contributor of Sheriff Blanas.  Again, this proves access.

286.  Mr. Dennis Treadaway received an honorary Deputy badge from Sheriff Blanas and claims to have asked Sheriff Blanas for a CCW, to which Sheriff Blanas replied "no", indicating direct access to him.

287.  Mr. Artemious Roussos asked Sheriff Blanas both by telephone and in person for a CCW, but was denied, but had direct access to Sheriff Blanas.

288.  Mr. Charles Mier, owner of Club 2me, a large contributor both in monies and in kind (co-chair,  Lou Blanas fund raiser) was upset when Sheriff Blanas told him in a phone conversation, "no" CCW.   Mr Mier started the application process but abandoned the idea.  Again, he at least had direct access to Sheriff Blanas.

289.  Mr. David Townsend, a well known political consultant, asked Sheriff Blanas for a CCW but he told him "he would absolutely not issue a CCW permit, and he would not approve a permit for me."  If Sheriff Blanas has nothing to do with the CCW process, how is it he can deny one?  He would/does not have any idea who applies and who does not apply.  Again a person of privilege and influence had direct access to Sheriff Blanas.

290.  Mr. John G. Manikas' permit expired in 1998.  He asked Sheriff Blanas about

renewing it. Sheriff Blanas told him there was "no continuing justification for one and because business had contributed to his campaign, he would not authorize a renewal of my permit." Cryptically, Manikas never identifies the name of the business.

291. This statement by Mr. Manikas flies in the face of statement made by Detective Fred Mason in his motion in support of DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT. Detective Mason states, "During both times I was assigned to SIIB, neither Sheriff Craig nor Sheriff Blanas ever requested any special review of an application, denial of an application, or the issuance of a permit to any individual. Neither Sheriff attended the Evaluation Committee meetings where the applications were evaluated and decisions made as to whether or not a permit would be issued."

292. If Sheriff Blanas is not involved in any way in the application process, how can he personally deny a permit to Mr. Foondos, Mr. Dennis Treadaway , Mr. Artemious Roussos, Mr. Charles Mier, Mr. David Townsend, and Mr. John G. Manikas?

293. Again, if Sheriff Blanas was not involved in the CCW application whatsoever, how is it that he can deny an applicant verbally. And what original justification evaporated and how did Sheriff Blanas know that?

294. Ms. Nancy Dicenzo, a campaign contributor and personal friend of Sheriff Blanas, asked him for a CCW but was told "he would not personally issue one because of the scrutiny such an act would provoke."

295. However, unlike the message given to Mr. Foondos, Mr. Dennis Treadaway, Mr. Artemious Roussos, Mr. Charles Mier, Mr. David Townsend, and Mr. John G. Manikas, Sheriff Blanas encourages Ms. Dicenzo to apply through the application process, EVEN THOUGH SHE CONTRIBUTED TO HIS CAMPAIGN!!!

296. Neither one of the Plaintiffs had this type of access to the then Sheriff

Case 2:08-cv-02064-JAM-KJM Document 56 Filed 10/21/2009 Page 61 of 64

Blanas. They are not in his circle of contributors, friends and associates.

297. Therefore, Defendants' declarations actually prove my point: there are people who have access to the Sheriff to request simple favors, such as a CCW. The facts clearly establish that those with access and money are granted CCWs. There is no doubt in my mind.

298. It is my opinion, to a degree of reasonable certainty, that the CCW approval process is not a process at all, but consists of a committee of political appointments who serve at the pleasure of the Sheriff. It is reasonable to infer that these appointees are also in direct contact with the Sheriff's campaign contributors, or have knowledge of who they are.

299. Further, I opine the following conclusions: Defendant Blanas signed a declaration purportedly identifying 229 individuals who were granted permits under his administration who did not allegedly contribute to his campaign.

300. However, he also failed to identify the other 80 (+/-) who either personally donated, or were affiliated with companies that donated to his campaign, and fails to produce a single application of a person who applied after contributing to his campaign and who was denied a CCW.

301. Defendant Blanas also fails to explain how a campaign contributor can make an "oral application" for a CCW when there is no written or published policy for such a procedure.

302. Defendant Blanas testified that; ( 1) he personally issued a CCW to Mr. Gerber; (2) that both Mr. Gerber and his company Energetic Painting and Drywall, Inc. have contributed to his political campaigns for Sheriff of Sacramento County, and (3) that they own a vacation home together in Reno, Nevada, and in fact Sheriff Blanas flies in Mr. Gerber's airplane. Blanas Depo. 46:7-16, 47:9-48:25, 55:11-18, 63:14-67:7.

303. Further, after reviewing official campaign records produced by Defendant

Case 2:08-cv-02064-JAM-KJM Document 156 Filed 10/26/10 Page 62 of 64

Blanas, I note that Energetic has contributed, but I could not locate a single document showing how, when, and how much Mr. Gerber personally contributed, as testified to by Sheriff Blanas.

304. Attached hereto as Twomey Exhibit “D”, commencing at page 1 (and Exhibit “5" as well) are the relevant portions of the CCW application and file of one Edward Gerber, as testified to by Amber Wong and Defendant Blanas.

305. On July 25, 2006, this CCW was approved personally by Blanas, though Blanas has stated under the penalty of perjury that he does not get involved with the approval process of CCWs. Attached hereto as **Exhibit “K"** is a true and correct copy of Blanas’s Tahoe-Neveda property showing ownership. Gerber’s application was approved personally by Blanas because Gerber likes to carry a lot of cash and jewelry for his personal use. See **Exhibit “5"**.

306. Edwin Gerber owns a million dollar vacation home in Reno with Defendant Blanas, and Gerber contributes to Blanas’ campaign under Energetic Drywall, which is reported in campaign disclosure records under the penalty of perjury, but his individual contributions were not reported, though Defendant Blanas testified that Gerber personally donated money; Defendant Blanas personally approved Gerber’s CCW application with a stated justification by Gerber that he carries large sums of cash and wears expensive jewelry. Blanas Depo. 46:7-16, 47:9-48:25, 55:11-18, Blanas Depo. 63:14-67:7. Energetic Painting and Drywall, Inc., 3030 Orange Grove Ave, North Highlands, CA 95660, Number: C1137947 Date Filed: 4/1/1983.

307. I am familiar with the Deputy Aaron McAfee incident through personal conversations with Deputy McAfee, his watch commander at the time, and by reading a copy of Deputy McAtee’s arrest report which he gave me to read.

308. This is the now called “Colanfrancesco incident”.

309. I have never read, been provided, nor relied upon any documents in any personal file, nor any internal affairs investigation to form conclusions regarding the Colanfrancesco matter,

Case 2:08-cv-02064-JAM-KJM Document 1 Filed 11/26/2007 Page 63 of 72

just the crime report and my conversation's with his watch commander regarding the report, and deputy McAfee's work product.

310. Hence, § 832.7 of the penal code is not involved.

311. It was my conclusion at the time, and remains to this day that Deputy Aaron McAtee was charged with and punished for conduct that any and all patrol deputies were required to do at the time: show on the log sheet that a "report" was necessary, but complete the report in the next few weeks without the use of overtime.

312. I am convinced to this day that the false charge against Deputy McAtee resulted in his failure to recognize that Colanfrancesco was immunized from suffering any action resulting from criminal activity in Sacramento County.

313. These residual facts and opinions confirm my original opinions. In fact, Defendants' evasive declarations completely confirm the truth of the matter, for Defendants had every opportunity to present Declarations from their biggest, most influential campaign contributors, and failed to do so.

314. I have read and complied with the protective order issued in this case.

I declare that the information contained in this declaration is true and correct and made under the penalty of perjury under the laws of the United States of America, signed in Sacramento, CA on Wednesday, November 21, 2007.

///

///

///

Case 2:02-cv-02064-JAM-KJM Document 150 Filed 11/26/2007 Page 64 of 64

I declare under the penalty of perjury that the information contained herein is true and correct, and are of my own personal knowledge. Executed in the County of Sacramento, CA, on November 21, 2007.

/s/ Timothy G. Twomey (Original Signature on File with Attorney)
Lt. Timothy G. Twomey (Ret.)

SACRAMENTO COUNTY  SHERIFF'S DEPARTMENT

LOU BLANAS
*Sheriff*

CONCEALED WEAPONS PERMIT EVALUATION

APPLICANT'S NAME: ~~EDWARD~~ GERBER (Edwin)

OCCUPATION: BUSINESS OWNER

DATE APPLICATION SUBMITTED: 07-25-06

DATE OF EVALUATION:

APPROVED: ✓ DENIED: ____

RENEWAL: ____ TRAINING DATE: ____

COMMENTS: Approved by Sheriff Blanas

CHIEF CHRISTINE HESS — NO - REVOCATION 3-15-07

CAPTAIN ~~JIM COOPER~~ Steve B... — NO " "

CAPT Scott Jones
CAPTAIN ~~DOUG LEE~~ — REVOKE 3/15/07

**************************************************************************

DATE OF APPEAL: ____

CHIEF DEPUTY BILL KELLY

APPROVED: ✓ DENIED: ____

COMMENTS: ____

REFER ALL CORRESPONDENCE TO: SACRAMENTO SHERIFF'S DEPARTMENT • P.O. BOX 988 • SACRAMENTO, CA 95812-0988

SACRAMENTO COUNTY  SHERIFF'S DEPARTMENT

**Lou Blanas**
*Sheriff*

CONFIDENTIAL

GORSKI - DO NOT DUPLICATE

July 26, 2006

Edward Gerber
[redacted]

Dear Mr. Gerber:

It has been brought to my attention that you have made verbal application for an Emergency Concealed Weapons (CCW) permit. Lieutenant Mike McKeel has briefed me regarding your concerns, and I concur that a potential threat does exist.

Therefore, I am granting your request for a CCW to be issued on an emergency basis. This permit will be issued today and valid until October 26, 2006.

During the next thirty days, I recommend you work with Lieutenant Mike McKeel to ensure that formal application is made through our CCW Committee. If you have any further needs concerning the safety of you or your immediate family members, please do not hesitate to contact Lieutenant McKeel at (916) 874-5601.

Please feel free to contact me at any time should you need my assistance

Very truly yours,

LOU BLANAS, SHERIFF

LB/dlm

REFER ALL CORRESPONDENCE TO SHERIFF'S DEPARTMENT • P.O. BOX 988 • SACRAMENTO, CALIFORNIA 95812-0988

State of California, Department of Justice

# Standard Application for CCW License

| Official Use Only - Type of Permit Requested | |
|---|---|
| () Standard | () Judge |
| () Reserve Officer | () 90 Day |

## Public Disclosure Admonition

I understand that I am obligated to be complete and truthful in providing information on this application. I understand that all of the information disclosed by me in this application may be subject to public disclosure.

[signature] 7-25-00

Applicant Signature — Date

Witness Signature / Badge Number — Date

## Section 1 - Applicant Personal Information

Name: GERBER (Last) EDWIN (First) GEORGE (Middle)

If Applicable,
Maiden Name or Other Name(s) Used:

City and County of Residence: SACRAMENTO

Country of Citizenship: U.S

Date of Birth: REMOVED BY DEFENDANT Place of Birth: REMOVED BY DEFENDANT (City, County, State)

Height: 5'10 1/2 Weight: 285 Color Eyes: BRN Color Hair: DRK. BRN

## Section 2 - Applicant Clearance Questions

1. Do you now have, or have you ever had a license to carry a concealed weapon (CCW)?
No X Yes ___ (If yes, please indicate below. Use additional pages if necessary.)

Issuing Agency ________ Issue Date ________ CCW# ________

2. Have you ever applied for and been denied a license to carry a concealed weapon?
No ___ Yes ✓ (If yes, give agency name, date and reason for denial.)

State of California, Department of Justice

## Standard Application for CCW License

## Section 6 - Agreement to Restrictions and to Hold Harmless

I accept and assume all responsibility and liability for, injury to, or death of any person, or damage to any property which may result through any act or omission of either the licensee or the agency that issued the license. In the event any claim, suit or action is brought against the agency that issued the license, its chief officer or any of its employees, by reason of, or in connection with any such act or omission, the licensee shall defend, indemnify, and hold harmless the agency that issued the license, its chief officer or any of its employees from such claim, suit, or action.

I understand that the acceptance of my application by the licensing authority does not guarantee the issuance of a license and that fees and costs are not refundable if denied. I further understand that if my application is approved and I am issued a license to carry a concealed weapon, that the license is subject to restrictions placed upon it and that misuse of the license will cause an automatic revocation and possible arrest and that the license may also be suspended or revoked at the discretion of the licensing authority at any time. I am aware that any use of a firearm may bring criminal action or civil liability against me.

I have read, understand, and agree to the CCW license liability clauses, conditions, and restrictions stated in this Application and Agreement to Restrictions and to Hold Harmless.

I have read and understand the applicable Penal Code sections regarding False Statements on a CCW Application, Manslaughter, Killing in Defense of Self or Property, Limitation on Self-defense and Defense of Property, and Child Access and Firearm Storage, stated in this application.

I have read and understand Attachment 1 - California Prohibiting Categories for a CCW License, Attachment 2 - California Prohibiting Misdemeanors, and Attachment 3 - Federal Prohibiting Categories for Possessing Firearms. I further acknowledge that these Prohibiting Categories can be amended or expanded by state or federal legislative or regulatory bodies and that any such amendment or expansion may affect my eligibility to hold a CCW.

[signature] 7-25-06

Applicant Signature / Date

[signature] #11 7-26-06

Witness Signature / Badge Number / Date

State of California, Department of Justice

## Standard Application for CCW License

### Section 7 - Investigator's Interview Notes - (continued)

**If the CCW license is desired for self-protection, the protection of others, or for the protection of large sums of money or valuable property, you are required to explain and provide good cause for issuance of the license. For example, has your life or property been threatened or jeopardized? Explain incidents and include dates, times, locations, and names of police agencies to which these incidents were reported.**

**Details of Reason for Applicant Desiring a CCW License (use additional sheets if needed).**

CARRY LARGE SUMS CASH $4000-$5000
WEAR $15,000 WATCH + RINGS - EXPENSIVE JEWELRY

GORSKI DO NOT DUPLICATE

## Section 8 - Certification and Release of Information

I hereby give permission to the agency to which this application is made to conduct a background investigation of me and to contact any person or agency who may add to or aid in this investigation. I further authorize persons, firms, agencies and institutions listed on this application to release or confirm information about me and statements I have made as contained in this application.

Notwithstanding any other provision of law and pursuant to the Public Records Act (Government Code section 6250 et seq.), I understand that information contained in this application may be a matter of public record and shall be made available upon request or court order.

I hereby certify under penalties of perjury and Penal Code section 12051(b) and (c), that the answers I have given are true and correct to the best of my knowledge and belief, and that I understand and agree to the provisions, conditions, and restrictions herein or otherwise imposed.

Applicant Signature Date 7-25-06

Witness Signature / Badge Number #14 Date 7-26-06

GORSKI CONFIDENTIAL

State of California, Department of Justice

**Standard Application for CCW License**

## Section 7 - Investigator's Interview Notes

Applicant Name: KIMMEL, JACK MICHAEL
Last First Middle

Date of Birth: REMOVED BY DEFENDANT Age: 57

Social Security No.:

California DL/ID No.:

Driver's License Restrictions: NONE

Residence Address: SACRAMENTO, CA 95864
Apt. City State Zip

Mailing Address (if different):
Number Street Apt. City State Zip

Home / Personal Phone Numbers: (916)

Spouse's Name and Address: JANICE LUCIA KIMMEL
SACRAMENTO CA 95864

Applicant Occupation: BUILDING CONSTRUCTION

Business / Employer Name: KIMMEL CONSTRUCTION, INC.

Business Phone Number: (916)

Business Address:
SACRAMENTO, CA 95816
Number Street Apt. City State Zip

1. List all previous home addresses for the past five years.

S.

ORIGINAL NOT DUPLICATE

State of California, Department of Justice

## Standard Application for CCW License

### Section 7 - Investigator's Interview Notes - (continued)

**If the CCW license is desired for self-protection, the protection of others, or for the protection of large sums of money or valuable property, you are required to explain and provide good cause for issuance of the license. For example, has your life or property been threatened or jeopardized? Explain incidents and include dates, times, locations, and names of police agencies to which these incidents were reported.**

**Details of Reason for Applicant Desiring a CCW License (use additional sheets if needed).**

SELF DEFENSE

CONFIDENTIAL
GORSKI - DO NOT DUPLICATE